**Miguel DE GRANDY, Mario Diaz–Balart, Andy Ireland, Casimer Smericki, Van B. Poole, Terry Ketchel, Roberto Casas, Rodolfo Garcia, Jr., Luis Rojas, Lincoln Diaz–Balart, Javier Souto, Justo Luis Poso, Alberto Cardenas, Rey Velazquez, Luis Morse, Alberto Gutman, Karen E. Butler, Sgt. Augusta Carter, Jean Van Meter, Anna M. Pinellas, Robert Woody, Gina Hahn, Bill Petersen, Terry Kester, Margie Kincaid, and Brooks White, Plaintiffs,**

v.

**T.K. WETHERELL, in his official capacity as Speaker of the Florida House of Representatives, Gwen Margolis, in her official capacity as President of the Florida Senate, Lawton Chiles, in his official capacity as Governor of the**

State of Florida, Jack Gordon, in his official capacity as Chairman of the Senate Reapportionment Committee, Peter R. Wallace, in his official capacity as Chairman of the House Reapportionment Committee, Jim Smith, in his official capacity as Secretary of State of Florida, Robert Butterworth, in his official capacity as Attorney General of Florida, Defendants.

FLORIDA STATE CONFERENCE OF NAACP BRANCHES, T.H. Poole, Sr., Whitfield Jenkins, Leon W. Russell, Willye Dennis, Turner Clayton, Rufus Brooks, Victor Hart, Kerna Iles, Roosevelt Walters, Johnnie McMillian, Phyllis Berry, Mary A. Pearson, Mable Butler, Iris Wilson, Jeff Whigham, Al Davis, Peggy Demon, Carlton Moore, Richard Powell, Neil Adams, Leslie McDermott, Robert Saunders, Sr., Irv Minney, Ada Moore, Anita Davis, and Calvin Barnes, Plaintiffs,

v.

Lawton CHILES, in his official capacity as Governor of Florida, Jim Smith, in his official capacity as Secretary of State of Florida, Robert Butterworth, in his official capacity as Attorney General of Florida, Gwen Margolis, in her official capacity as President of the Florida Senate, T.K. Wetherell, in his official capacity as Speaker of the Florida House of Representatives, Jack Gordon, in his official capacity as Chairperson of the House Reapportionment Committee, and Peter R. Wallace, in his official capacity as Chairman of the House Reapportionment Committee, Defendants.

UNITED STATES of America, Plaintiff,

v.

STATE OF FLORIDA, a State of the United States; T.K. Wetherell, Speaker of the Florida House of Representatives; Gwen Margolis, President of the Florida Senate; Lawton Chiles, Governor of the State of Florida; Robert Butterworth,

Attorney General for the State of Florida; Peter R. Wallace, Chairman of the House Reapportionment Committee; Jack Gordon, Chairman of the Senate Reapportionment Committee; Jim Smith, Secretary of State for the State of Florida, Defendants.

Nos. TCA 92–40015–WS, TCA 92–40131–WS and TCA 92–40220–WS.

United States District Court, N.D. Florida, Tallahassee Division.

July 17, 1992.

**1553**

E. Thom Rumberger, Rumber, Kirk & Caldwell, Orlando, FL, George N. Meros, Jr., Rumberger, Kirk & Cladwell, Tallahassee, FL, for plaintiffs.

Mark S. Levine, Tallahassee, FL, for Simon Ferro.

George L. Waas, Denis Dean, Asst. Atty. Gen., Dept. of Legal Affairs, Tallahassee, FL, for third-party defendant.

James A. Peters, Cobb, Cole & Bell, Tallahassee, FL, for Wetherell & Wallace.

F. Perry Odom, Joseph C. Jacobs, Ervin, Varn, Jacobs, Odom & Ervin, Tallahassee, FL, for Andy Ireland.

Craig T. James, pro se.

Donald M. Middlebrooks, Steel, Hector & Davis, Miami, FL, for Jim Bacchus.

Edwin I. Ford, Largo, FL, for George C. McGough et al.

Richard E. Doran, Asst. Deputy Atty. Gen., Dept. of Legal Affairs, Tallahassee, FL, for Chiles & Butterworth.

Sidney L. Matthew, Gorman & Matthew, P.A., Tallahassee, FL, for Florida AFL–CIO.

Halley B. Lewis, pro se.

Daniel J. Webster, pro se.

W. Douglas Moody, Jr., Stephen N. Zack, The Senate Committee on Reapportionment, Mark Herron, Mitchell D. Franks, Akerman, Senterfitt, Eidson, & Moffitt, Tallahassee, FL, for Alzo Reddick.

Parker D. Thomson, Carol A. Licko, Miami, FL, H. Lee Moffitt, Akerman, Senterfitt, Eidson & Moffitt, Tallahassee, FL, for Proffer as Special Master.

C. Clyde Atkins, Sr. U.S. Dist. Judge, S.D.Fla., Miami, FL, for Special Master.

Stephen N. Zack, Miami, FL, for Margolis & Gordon.

Aurora Ares, Thornton David, Murray, Richard & Davis, P.A., Miami, FL, for Cuban American Bar Ass'n.

Larry White, Tallahassee, FL, Frank R. Parker, Brenda Wright, Lawyers' Committee for Civ. Rights Under Law, Washington, D.C., Gwen Humphrey, et al.

Charles G. Burr, Tampa, FL, Harry L. Lamb, Jr., Perry & Lamb, P.A., Orlando, FL, Dennis Courtland Hayes, Willie Abrams, NAACP Special Contribution Fund, Baltimore, MD, for Florida State Conference of NAACP Branches.

Steven Mulroy, Gerald Hebert Dept. of Justice, Civ. Rights Div.–Voting Section, Washington, D.C., for U.S.

Henry C. Hunter, Charles E. Vanture, Tallahassee, FL, Rodney G. Gregory, Rodney G. Gregory, P.A., Jacksonville, FL, for Reaves, Brown & Hargarett.

Edwin J. Turanchik, Zinober & McCrea, Tampa, FL, for Gwen Margolis.

M. David Gelfand, Tulane Law School, New Orleans, LA, for Independent Expert.

Katharine Inglis Butler, University of South Carolina Law School, Columbia, SC, for AFL–CIO.

Alan K. Fertel, Alberto R. Cardenas, Ferrell, Cardenas, Fertel & Morales, P.A., Miami, FL, for Fertel & Cardenas.

Samuel Dubbin, Steel, Hector & Davis, Miami, FL, for Ron Silver, Elaine Bloom, et al.

Bill L. Bryant, Jr., Foley & Lardner, Tallahassee, FL, for Stephen R. McNamara.

Before HATCHETT, Circuit Judge, STAFFORD and VINSON, District Judges.

## I. PROCEDURAL HISTORY

Florida currently has forty Senate districts and one hundred twenty House of Representative districts. These districts were created in 1982 and are currently malapportioned. According to the 1990 census data, the total

population of the state of Florida is 12,937,926 persons. Between the census of 1980 and 1990, Florida's population increased 3,213,602 persons. To achieve equality between Florida's forty Senate districts, each district would ideally contain 323,448 persons. To achieve equality between Florida's one hundred twenty House districts, each district would ideally contain 107,816 persons.

On the opening day of the 1992 Florida legislative session, Miguel De Grandy, a member of the Florida House of Representatives, and other registered voters ("De Grandy plaintiffs") filed a complaint against the Speaker of the Florida House of Representatives, the President of the Florida Senate, the Governor of Florida, and other state officials. The De Grandy plaintiffs filed the complaint in this court challenging the constitutionality of Florida's current congressional and state legislative districts. The De Grandy plaintiffs alleged that the current districts violate both the Equal Protection Clause of the United States Constitution and the Voting Rights Act of 1965, as amended, and urged this court to assert jurisdiction in order to redistrict and reapportion the state.

The De Grandy plaintiffs filed a first amended complaint on January 23, 1992. The defendants moved to dismiss the complaint. After hearing arguments on the motion, the court dismissed the action without prejudice for lack of subject matter jurisdiction (document 41). On March 9, 1992, the De Grandy plaintiffs filed a second amended complaint (document 44) alleging violations of Article I, Section 2 and of the Fourteenth and Fifteenth Amendments to the United States Constitution as well as violations of Sections 2 and 5 of the Voting Rights Act of 1965 as amended, 42 U.S.C. § 1973 et seq.

In short, Count I alleged that the present Florida House and Senate districts were unconstitutional inasmuch as they violated the Equal Protection Clause of the Fourteenth Amendment, Article I, Section 2 of the United States Constitution and the "one-person, one-vote" principle. Count II alleged that because these districts diluted the voting strength of minority voters, they violated the Voting Rights Act of 1965, as amended. Count III alleged that the Florida Legislature was at an impasse in adoption of state redistricting plans. Counts V and VI alleged that the time lines for redistricting set forth in Article III, Section 16 of the Florida Constitution, in conjunction with the preclearance requirements of Section 5 of the Voting Rights Act, "permit the adoption and implementation of new district lines to take place so late in the year after the decennial census" that they result in a deprivation of plaintiffs' right to participate in the 1992 elections on a fair and equal basis.[1] Docu-

---

1. Article 3, Section 16(a) of the Florida Constitution provides that:

*Senatorial and representative districts.* The legislature at its regular session in the second year following each decennial census, by joint resolution, shall apportion the state in accordance with the constitution of the state and of the United States into not less than thirty nor more than forty consecutively numbered senatorial districts of either contiguous, overlapping or identical territory, and into not less than eighty nor more than one hundred twenty consecutively numbered representative districts of either contiguous, overlapping or identical territory.

If the legislature should fail at its regular session to apportion themselves into the legislative districts as required by Article 3, Section 16, the governor is required to reconvene the legislature within thirty days in a special apportionment session not to exceed thirty consecutive days. Fla. Const. Art. 3 § 16(a). During this time, no other business shall be transacted and it shall be the mandatory duty of the legislature to adopt a joint resolution. Fla. Const. Art. 3 § 16(a). If

the legislature adopts a reapportionment plan, the constitution requires the attorney general to petition the Florida Supreme Court for a declaratory judgment determining the validity of the apportionment. Fla. Const. Art. 3 § 16(c). The Supreme Court, in accordance with its rules, shall permit adversary interests to present their views and, within thirty days from the filing of the petition, shall enter its judgment.

If the Supreme Court determines that the apportionment made by the legislature is invalid, the governor shall reconvene the legislature within five days thereafter in an extraordinary apportionment session which shall not exceed fifteen days, during which the legislature shall adopt a joint resolution of apportionment conforming to the judgment of the Supreme Court. Fla. Const. Art. 3 § 16(d). If the Supreme Court determines that the legislative apportionment is valid, the plan must be precleared by the Department of Justice before it may be considered validly enacted. Until the plan is precleared, it may not be used in any election.

The Florida constitution is silent as to what occurs if the Department of Justice fails to pre-

ment 44 at ¶ 120. Count V alleged a facial challenge, while Count VI alleged an "as applied" challenge. Count VII alleged that certain defendants have "intentionally misused the time lines and procedures found in Article III ... to delay the redistricting process to the advantage of white incumbents and to the detriment of voters and would be challengers to those incumbents." Document 44 at ¶ 130. On March 13, 1992, the Florida legislature ended its regular session without adopting a state reapportionment plan.

On March 27, 1992, this three-judge court convened, denied all motions to dismiss and established an expedited schedule for adoption of congressional and state legislative plans by May 29, 1992 (document 56). That scheduling order in no way enjoined or prevented state redistricting and reapportionment agencies from attempting to enact their own plans. On April 2, 1992, the Governor of Florida called a special redistricting and reapportionment session of the Florida Legislature pursuant to Article III, Section 16(a), of the Florida Constitution. On April 10, 1992, the legislature adopted Senate Joint Resolution 2–G reapportioning state House and Senate districts.

Meanwhile, this case progressed and on April 6, 1992, the court appointed a special master pursuant to Fed.R.Civ.P. 53 for both Congressional and legislative reapportionment. On April 7, 1992, the court consolidated this case with a similar lawsuit filed by the Florida State Conference of the NAACP

Branches and many individual African–American voters. The court also granted other persons and organizations leave to intervene or act as amicus curiae.[2] On April 17, 1992, the Attorney General of the State of Florida submitted Senate Joint Resolution 2–G concerning state legislative reapportionment to the United States Department of Justice (DOJ) for preclearance pursuant to Section 5 of the Voting Rights Act. That same day, this court issued an order bifurcating the congressional redistricting and state reapportionment hearings. The special master promptly concluded his hearings on congressional redistricting and issued his report and recommendation. This court considered the parties objections, conducted a hearing and issued its judgment on May 29, 1992 (document 439).

On May 13, 1992, the Florida Supreme Court validated Senate Joint Resolution 2–G. As a result of the validation, this court stayed proceedings related to state reapportionment until May 27, 1992. A hearing was held on May 27, 1992 at which time the court considered all pending motions.[3] At the hearing, the court granted the government's motion to be dismissed as a party to the litigation, but invited comments from J. Gerald Hebert of the United States DOJ. Mr. Hebert advised the court that the Justice Department would probably issue its decision by June 17, 1992 as to whether the House and Senate plans would be precleared. All other motions were

clear a plan previously validated by the Supreme Court. In its order dated May 13, 1992, the Florida Supreme Court explicitly "retain[ed] exclusive state jurisdiction to consider any and all future proceedings relating to the validity of this apportionment plan." *In re Constitutionality of Senate Joint Resolution 2G, Special Apportionment Session 1992,* 597 So.2d 276, 286 (Fla. 1992).

2. Those acting as amici are Simon Ferro, State Chairman of the Florida Democratic Party; Common Cause; Florida AFL–CIO; United States Representative Craig James; the Cuban American Bar Association; The Coalition of Hispanic Women; and State Representative Daniel Webster. Plaintiff-intervenors include Gwen Humphrey, Vivian Kelly, Gene Adams, Wilmateen W. Chandler, Dr. Percy L. Goodman, Jesse L. Nipper, Moease Smith, and Carolyn L. William ["Humphrey Intervenors" or "plaintiffs"];

State Representatives Darryl Reaves, Corinne Brown and James T. Hargrett ["Reaves–Brown" or "plaintiffs"], United States Representative Jim Bacchus; and United States Representative Andy Ireland. State Representative Alzo Reddick is a defendant-intervenor.

3. The motions included the Attorney General's Motion to Dismiss for Lack of Subject Matter Jurisdiction and for Failure to State a Claim Upon Which Relief Can Be Granted (document 363), an Application for Preliminary Injunction Against Implementation of SJR 2–G filed by the Humphrey intervenors (document 390), a Motion for Temporary Restraining Order and Preliminary Injunction (document 391) and a Motion to Lift Stay, Establish Scheduling Order and Set Trial on Legislative Redistricting (document 416) filed by the De Grandy plaintiffs (document 416) and a Motion to Dismiss and for Injunctive Relief filed by the defendants' (document 426).

denied, and the stay of legislative reapportionment was continued.

On June 16, 1992, the DOJ issued its preclearance decision, noting that its review and determination addressed the plans only insofar as the five preclearance counties were affected. Exhibit 1 to document 447. The Attorney General of the United States did not interpose any objection to the Florida House of Representatives redistricting plan. The DOJ refused to preclear the Senate plan stating:

> We are unable to reach the same conclusion with regard to the Senate redistricting plan. With regard to the Hillsborough County area, the state has chosen to draw its senatorial districts such that there are no districts in which minority persons constitute a majority of the voting age population. To accomplish this result, the state chose to divide the politically cohesive minority populations in the Tampa and St. Petersburg areas. Alternative plans were presented to the legislature uniting the Tampa and St. Petersburg minority populations in order to provide minority voters an effective opportunity to elect their preferred candidate to the State Senate.... [T]he information before us, including the economic and other ties between Tampa and St. Petersburg, as well as the political cohesiveness of minority voters in those two cities, demonstrates that the two areas do share a commonality of interest. Finally, we have examined evidence, including evidence in the legislative record, which suggests that the state's approach to senatorial redistricting in the Hillsborough area was undertaken with an intent to protect incumbents. Such a rationale, of course, cannot justify the treatment of minority voters in this area by the State Senate plan.

Exhibit 1 to document 447 at 2–3.

Plaintiffs immediately filed a Renewed and Expedited Motion to Lift Stay, Establish Scheduling Order, and Set Trial on Legislative Redistricting (document 444) and a Motion for Leave to File Third Amended Complaint (document 448). The latter was granted and in their third amended complaint, plaintiffs added a count alleging that the 1992 joint resolution of apportionment violated Section 2 of the Voting Rights Act. On June 18, 1992, the court issued a scheduling order and set a hearing on all pending motions for June 26, 1992 (document 449).

The Florida Supreme Court set an expedited schedule to address the DOJ's objection to the Senate plan. In its order dated June 17, 1992, the Supreme Court encouraged the legislature to adopt a proper reapportionment plan, taking into consideration the objections of the Justice Department. *See* Exhibit A to document 462 at 2. The order continued: "In the event the Legislature declares its inability to adopt a reapportionment plan or fails to adopt a plan by June 24, 1992, this Court will conclude that a legislative impasse has occurred, and this Court will promptly undertake to make such reapportionment." The court also set forth an abbreviated time frame within which action must be taken.[4]

In a letter dated June 18, 1992, the Speaker of the House (defendant Wetherell) and President of the Senate (defendant Margolis) advised the Supreme Court of their decision not to convene their respective Houses in an extraordinary apportionment session. *See* Exhibit A to document 478. The court was also advised that the Governor did not intend to convene the legislature in an extraordinary apportionment session. Exhibit A to document 478. In an order dated June 17, 1992, the Florida Supreme Court declared a legislative impasse and adopted an amended schedule.[5]

> (c) June 26, 1992."

Exhibit A to document 462 at 2.

---

**4.** "[A]ll interested parties are advised that they may file with this Court pertinent briefs and proposed alternate plans by no later than the following, whichever occurs first:

(a) two days after the Legislature's adoption of a reapportionment plan;

(b) two days after the Legislature's declaration of an inability to adopt a reapportionment plan; or

**5.** By that order, each interested person was permitted to submit by noon, June 22, 1992, a proposed correction to modify the redistricting plan for the Florida Senate so as to resolve the specific objection outlined by the United States Department of Justice in senate districts affecting

Jurisdictional questions were raised both in this court and in the Florida Supreme Court. The De Grandy plaintiffs filed their action in this court on January 14, 1992, and have continually asserted that jurisdiction to correct the Department's Section 5 objection lies only in this court. The Florida Supreme Court, however, without discussing the propriety of concurrent federal jurisdiction, held that

[T]he reapportionment of state legislative bodies is not a power delegated by the Constitution of the United States to the federal government. Under the provisions of the Tenth Amendment to the United States Constitution, this is a power reserved to states. Of course, this Court is obligated to apply any applicable federal constitutional provisions and any federal statutes implementing these provisions.

The Florida Constitution places upon this Court the responsibility to review state legislative reapportionment. Art. III, § 16, Fla. Const. Pursuant to that authority, we approved the original legislative reapportionment and retained jurisdiction to entertain subsequent objections thereto. Consistent with the provisions of article III, section 16 of the Florida Constitution, we believe that it is our obligation to redraw the plan to satisfy the objection of the Justice Department now that the Legislature has declared that it is not going to do so.

*In re Constitutionality of Senate Joint Resolution 2G, Special Apportionment Session 1992*, 601 So.2d 543, 545 (Fla.1992) (document 491). Defendants have consistently maintained that because Article III, Section 16 of the Florida Constitution specifically conferred jurisdiction over legislative redistricting to the Florida Supreme Court, this court should abstain in deference to the principles of comity and federalism. This court has declined the invitation to abstain.

On June 25, 1992, the Florida Supreme Court adopted a Senate redistricting plan which it felt complied with the DOJ's objec-

tion to Hillsborough County. After reviewing the six submitted plans, the Supreme Court adopted the plan submitted by Gwen Humphrey, et al., and supported by Representative Darryl Reaves, et al. ["Humphrey-Reaves plan"]. *Constitutionality of SJR–2G*, 601 So.2d at 546. Chief Justice Shaw wrote separately to indicate his opinion that the overall plan—including the present revision—does not comply with Section 2 of the Voting Rights Act:

Because this Court's review in the present proceeding is limited in scope to DOJ's section 5 preclearance inquiry, I concur in the majority opinion. I believe the present revision in the plan meets the objection evinced in DOJ's admittedly restricted review. I write to note, however, that I still conclude that the overall plan, including the present revision, fails under Section 2 of the Act because it does not provide an equal opportunity for minorities to elect representatives of their choice to the Florida legislature, as noted in my earlier dissent.

*Constitutionality of SJR–2G*, 601 So.2d at 548 (Shaw, C.J. specially concurring).

The focus of this litigation has continually shifted. Plaintiffs' first amended complaint alleged that the delay inherent in Article III, Section 16 of the Florida Constitution (and the fact that the legislature was not expected to pass a reapportionment plan in time for the scheduled 1992 elections) resulted in an unconstitutional intrusion in a citizen's right to vote. When the legislature passed SJR 2–G, plaintiffs asserted that this plan would not be precleared by the DOJ, and then when the Senate plan was, indeed, not precleared, plaintiffs asked this court to adopt a plan which complied with Section 5 of the Voting Rights Act.

On June 23, 1992, the DOJ filed in this court its own lawsuit[6] against the State of Florida and several elected officials alleging that (1) the redistricting plans for the members of the Florida Legislature dilute the voting strength of African–American and

---

Hillsborough County. Furthermore, each interested person was permitted to submit by noon, June 23, 1992; a report analyzing and comparing the merits of any proposal.

**6.** *United States v. State of Florida,* et al., TCA 92–40220-WS.

Hispanic citizens in several areas of the state in violation of Section 2 et seq. of the Voting Rights Act, 42 U.S.C. § 1973, et seq. and (2) the state's proposed Senate plan in the Hillsborough County area divides the politically cohesive minority populations in the Tampa and St. Petersburg areas such that there are no senatorial districts in which minority persons constitute a majority of the voting age population.[7] The *De Grandy* plaintiffs were also permitted to amend their complaint to allege Section 2 violations in both the House and Senate plans. *See* document 448.[8] On June 26, 1992, this court commenced its hearing on legislative reapportionment. At the outset, the court ruled on several pending motions [9] and heard argument on the others. After argument, the court granted Alberto R. Cardenas' and Alan K. Fertel's Motions for Leave to Appear Pro Hac Vice (documents 482 and 483) and the United States' Motion to Consolidate its lawsuit into the pending litigation (document 2).[10] The court also denied · as moot Defendant Wetherell's and Margolis' Motions to Quash Subpoena (documents 485 and 487), and denied Plaintiffs' Motion to Strike Proposed State Senate Re-

districting Plans Submitted by Margolis and Wetherell (document 478). The court then turned to the Florida Senate redistricting plan.

The DOJ indicated its belief that the Florida Supreme Court's modification to the Hillsborough County area Senate districts satisfied its previous objection. The Department stated that a preclearance decision would be made within days of the State's submission of the plan to the Department. The same day, this court imposed the Florida Supreme Court plan as its own plan for section 5 purposes. *See* Tr. I–37. The effect of this was to eliminate the need for preclearance. "Plans imposed by court order are not subject to the [preclearance] requirements of § 5." *Wise v. Lipscomb*, 437 U.S. 535, 542, 98 S.Ct. 2493, 2498, 57 L.Ed.2d 411 (1978); *see also State of Texas v. United States of America*, 785 F.Supp. 201, 205 (D.D.C.1992). At the same time, however, the court indicated its intention to entertain Section 2 challenges on both the Florida Senate and Florida House plans.[11]

---

**7.** This lawsuit was not entirely unexpected, for in its letter refusing to preclear the Florida Senate plan, the Justice Department indicated its belief that both the Senate and House plan contained Section 2 violations:

> Finally, we understand that there are challenges under Section 2 of the Voting Rights Act presently being considered in the consolidated cases of *De Grandy v. Wetherell*, No. 92–40015–WS and *Florida State Conference of NAACP Branches v. Chiles*, No. 92–40131–WS (N.D.Fla.). In addition, some of the comments we received alluded to various concerns involving the adequacy of the plans in non-covered counties. Because our review of these plans is limited by law to the direct impact on geographic areas covered by Section 5, we did not undertake to assess the lawfulness of the legislative choices outside of Collier, Hardee, Hendry, Hillsborough and Monroe counties. We do note, however, that allegations have been raised regarding dilution of minority covered jurisdictions, for example in the Pensacola–Escambia County area and the Dade County area. Because these and other legislative choices did not directly impact upon the five covered counties, they cannot be the basis of withholding preclearance of either plan.
> Exhibit 1 to document 447 at 6.

Because the Department's "preclearance" jurisdiction is limited to reviewing Florida's five covered counties, it could not reject either the

House or Senate plan on the basis that it did not comply with Section 2 of the Voting Rights Act.

**8.** This motion was granted by document 460. In its order dated May 13, 1992, the Florida Supreme Court indicated its willingness to entertain Section 2 challenges to the then-validated plan, but plaintiffs have elected to assert their Section 2 claims in this federal forum.

**9.** The court GRANTED the motions contained in documents 71, 204, 381, and 424 and DENIED the motions contained in documents 366, 368, 372, 386, 443, 445, 446, 450, 452, 453, 455, 459, 477, 481, 499 and 503.

**10.** By order dated June 27; 1992 and pursuant to Title 28, United States Code, Section 2284, the Chief Judge of the Eleventh Circuit Court of Appeals convened a three-judge panel consisting of the same three judges.

**11.** It was our intent to immediately conduct a section 2 review of the Senate plan and we adopted the plan despite its potential section 2 problems. Because the plan adopted by the Florida Supreme Court could not be a valid plan subject to a section 2 challenge until after it was precleared by the Department of Justice, we adopted the Supreme Court plan as our own plan in order to give the parties ·a formal plan to challenge.

In Count VIII of the *De Grandy* plaintiffs' fourth amended complaint [12], plaintiffs allege that both the Florida House and Senate redistricting plans encompassed in joint resolution of legislative reapportionment, SJR 2–G, violate Section 2 et seq. of the Voting Rights Act, Title 42, United States Code, Section 1973, *et seq.* *See* document 506 at 51–60. Specifically, plaintiffs contend that "[t]he joint resolution of apportionment ... unlawfully fragments cohesive minority communities and otherwise impermissibly submerges their right to vote and to participate in the electoral process." Document 506 at 52 ¶ 137. Plaintiffs attack both the Dade County districts in the Senate plan and the Dade and Escambia County districts in the House plan as violative of Section 2 [13], alleging that

The African–American population in Escambia County was split into two districts, one of 30% black population and one of 14% black population. SJR 2–G deliberately fractures Escambia County's African–American population in order to protect white, incumbent representative, Speaker-designate Bo Johnson. Alternative plans encapsulate the black population in a relatively compact, cohesive, 40% black community of interest.

\* \* \* \* \* \*

In Dade County, black citizens were fragmented in District 118 and District 119. Many African–American seats were also packed with many Hispanic citizens which dilutes the ability of African–Americans to elect candidates of choice.

\* \* \* \* \* \*

Hispanic voters are packed in Districts 110 (82.1%), 111 (75.7%), and 114 (77.5%) and

further submerges Hispanic voters in black minority districts, specifically, District 103 (62% black, 27.8% Hispanic), District 109 (63.0% black, 34.5% Hispanic), and District 118 (34.5% black, 27.1% Hispanic). Less egregious examples of packing, but still having the same dilutionary effect, are District 104 (57.8% black, 16.1% Hispanic), Anglo District 105 (19.2% Hispanic), Anglo District 106 (32.3% Hispanic), District 108 (66.2% black, 16.0% Hispanic). SJR 2–G appears to purposefully pack, fracture and submerge Hispanic population deliberately to dilute Hispanic voting strength;

Nine Hispanic–American majority districts were created in SJR 2–G; however, other plans submitted to the Legislature show that eleven majority-Hispanic-American seats can be created in the Dade County area. This dilution of Hispanic voting strength is accomplished by the aforementioned packing, fracturing, and submergence with the intent and purpose of protecting white incumbents;

\* \* \* \* \* \*

With respect to the plan for apportionment for the Florida State Senate, ... the redistricting plan enacted by the State of Florida creates 7 Senate districts in the Dade County area. The state's plan fragments the Hispanic population concentrations such that Hispanics comprise a majority of the voting age population only in three districts. The racial and ethnic population concentrations existing in the Dade County area are such that, if the Dade County

---

12. In a ruling from the bench on June 27, 1992, the court permitted plaintiffs to once again amend their complaint. Both the Justice Department and the NAACP plaintiffs allege section 2 violations; the *De Grandy* fourth amended complaint, however, is more precise.

13. In their fourth amended complaint, plaintiffs also attacked several other House districts. With court approval, plaintiffs later dismissed their Section 2 challenges to districts 8 (Leon, Gadsden, Calhoun, Jackson, and Liberty Counties), 22 (Alachua, Marion, Levy, Putnam, St. Johns Counties), 28 (Volusia, Seminole, Brevard, Counties), 45 (Polk and Hillsborough Counties), 55 (Pinellas County), and 82 (Charlotte, DeSoto, Highlands,

Indian River, Lee, Okeechobee, St. Lucie Counties). Although plaintiffs' motion indicates that this dismissal would be without prejudice, the court did not state whether the dismissal would preclude plaintiffs filing a subsequent lawsuit challenging the dismissed districts.

Because plaintiffs concede that a majority African–American district cannot be drawn in Escambia County, their challenge is not really based on Section 2 of the Voting Rights Act; rather, plaintiffs' allegations that the district lines were drawn with a discriminatory purpose is based on the Fifteenth Amendment to the United States Constitution.

area of the state is divided into equally populated legislative districts which respect communities of interest and follow other non-discriminatory plan-drawing criteria, Hispanics would constitute a significant voting age majority of the population in one additional Senate district in Dade County.

Document 506 at ¶¶ 141(a), (i); 142(a), (b). The complaint also alleges that the creation of these districts was both intentional and willful, and for the purpose of preserving white incumbent legislators and discriminating against African–American and Hispanic candidates and electorate. Document 506 at ¶ 145.

The entire trial lasted five days—from Friday, June 26, 1992 through Wednesday, July 1, 1992, excluding Sunday, June 28, 1992. The court first heard testimony concerning the Senate Plan. At the close of plaintiffs' case in chief, defendants orally moved for a directed verdict, which was denied by the court. Tr. III–216. The Senate defendants then presented their case. The court next turned to the attack upon the Dade County portion of the House plan.

The parties advised the court that they were attempting to settle the Escambia portion of the lawsuit by redrawing the Escambia County House districts. After hearing the testimony of one of plaintiffs' Escambia County witnesses, the court ruled from the bench that the "plaintiffs [had] established a prima facie case on the constitutional violation in the Escambia County area of Florida." Tr. IV–18. Before the close of plaintiffs' prima facie case, the court was notified that the parties, except for plaintiff-intervenor Darryl Reaves, had reached a settlement agreement as to the Escambia County House districts. Upon the granting of the House defendants' oral motion to dismiss Reaves for lack of standing as to Escambia County,[14] Tr. VIII–59, the court considered and approved the proposed consent judgment (document 548). *See* Tr. VIII–94.

On July 1, 1992, at the close of all testimony and oral argument, the court ruled from the bench that

the plaintiffs have shown a fourth Hispanic district can be drawn in accordance with the [*Thornburg v.*] *Gingles* [478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25] standard, but the plaintiffs[15] have failed to prove that a fourth Hispanic district can be drawn without creating a regressive effect upon Afro–American voters in Dade County and South Florida.... Consequently, under Supreme Court precedent, this court must give deference to the state policy as expressed in the Florida plan as validated by the Florida Supreme Court.

Tr. VIII–53. The court denied plaintiffs' oral motion for reconsideration. Tr. VIII–61.

After hearing closing argument as to the Dade County portion of the Florida House plan, the court ruled from the bench that "under the totality of the circumstances, the plaintiffs have shown a violation of Section 2 in that the plaintiffs have shown that more than nine Hispanic districts may be drawn without having or creating a regressive effect upon black voters in South Florida and in Dade County." Tr. VIII–83. The court indicated its intention to immediately proceed into the remedy phase of this case. The court later imposed the Modified De Grandy Plan as its own plan. Tr. VIII at 160. On July 2, 1992, the court entered judgment as to the 1992 Florida Senate Plan (document 553) and as to the 1992 Florida House Plan (document 554), the latter supplemented on July 6, 1992 (document 559). Following the trial, the House and Executive defendants moved for reconsideration (documents 550 and 556) These motions were denied (documents 555 and 560). The House defendants also moved for reconsideration, rehearing and for a stay (document 561) the court denied (document 571).

This opinion memorializes and explains the court's rationale for its July 2, 1992 rulings.

14. Reaves is a resident of Dade County.

15. The court specifically noted that its ruling applied to *all* plaintiffs and not just the De Grandy plaintiffs. Tr. VIII at 60.

## II.  FINDINGS OF FACTS AND CONCLUSIONS OF LAW [16]

### A.  Section 2 of the Voting Rights Act

As amended and in pertinent part, Section 2 of the Voting Rights Act of 1965 provides as follows:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 4(f)(2), as provided in subsection (b).

(b) A violation of subsection (a) is established if, based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the state or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.  The extent to which members of a protected class have been elected to office in the State or political subdivision is one "circumstance' which may be considered, provided that nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U.S.C. § 1973.

As originally passed, Congress intended for the language of Section 2 to parallel the language of the Fifteenth Amendment.  *City of Mobile v. Bolden*, 446 U.S. 55, 60–61, 100 S.Ct. 1490, 1496, 64 L.Ed.2d 47 (1980) (plurality opinion).  Because Section 2 parallelled the Fifteenth Amendment, the plurality of the Supreme Court held that a plaintiff was required to prove discriminatory intent to establish a violation of Section 2.  *Bolden*, 446 U.S. at 62, 71, 100 S.Ct. at 1497, 1502.  In response to the Supreme Court's ruling in

*Bolden*, Congress amended Section 2 in 1982 to include a "results" or "effects" test to determine whether racial vote dilution has occurred.  *See* Senate Report at 27; *Thornburg v. Gingles*, 478 U.S. 30, 35, 106 S.Ct. 2752, 2758, 92 L.Ed.2d 25 (1986); *see also Burton v. Sheheen*, 793 F.Supp. 1329, 1348 (D.S.C.1992).

In *Thornburg v. Gingles*, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), the Supreme Court received its first opportunity to review the 1982 Section 2 amendments. *Gingles* involved a Section 2 challenge to the use of multi-member districts in North Carolina.  The Court held that "[t]he essence of a Section 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." *Gingles*, 478 U.S. at 47, 106 S.Ct. at 2765.  Additionally, the law is clear that Section 2 extends coverage to "language minorities" including Hispanics.  *Chisom v. Roemer*, —— U.S. ——, —— & n. 18, 111 S.Ct. 2354, 2362 & n. 18, 115 L.Ed.2d 348 (1991); *Hastert v. State Bd. of Elections*, 777 F.Supp. 634, 648 (N.D.Ill.1991).

In determining whether a Section 2 violation has occurred, "a court must assess the impact of the contested structure or practice on minority electoral opportunities 'on the basis of objective factors.'"  *Gingles*, 478 U.S. at 44, 106 S.Ct. at 2763 (quoting Senate Report at 27).  The Supreme Court in *Gingles* reiterated the list of "typical" factors which may be relevant to, and probative of, a Section 2 claim as set forth in the Senate Report.  These "Senate factors" include:

1.  The extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

2.  the extent to which voting in the election of the state or political subdivision is racially polarized;

---

16.  Any finding of fact which may be a conclusion of law shall be considered a conclusion of law.  Conversely, a conclusion of law which may be a finding of fact shall be so considered.

3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. whether political campaigns have been characterized by overt or subtle racial appeals;

7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

Additional factors that in some cases have had probative value as part of plaintiffs' evidence to establish a violation are:

Whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group. And whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

See Senate Report at 206–07 (citing *White v. Regester*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973); *Zimmer v. McKeithen*, 485 F.2d 1297 (5th Cir.1973)).

This list is not exhaustive—it is not required that any number of the factors be proved and other factors may be relevant. *Gingles*, 478 U.S. at 45, 106 S.Ct. at 2763. The Court did note, however, that "the most important Senate Report factors bearing on Section 2 challenges to multi-member districts are the 'extent to which minority group members have been elected to public office in the jurisdiction' and the 'extent to which voting in the elections of the state or political subdivision is racially polarized.'" *Gingles*, 478 U.S. at 49 n. 15, 106 S.Ct. at 2765–66 n. 15 (quoting U.S.C.C.A.N.1982 at 206).

The Court, however, set forth the following important limitations on the extent to which these factors establish liability under Section 2:

[W]hile many or all of the factors listed in the Senate Report may be relevant to a claim of vote dilution through submergence in multimember districts, unless there is a conjunction of the following circumstances, the use of multimember districts generally will not impede the ability of minority voters to elect representatives of their choice.

*Gingles*, 478 U.S. at 48, 106 S.Ct. at 2765.

The Court then listed three circumstances which "are necessary preconditions for multimember districts to operate to impair minority voters' ability to elect representatives of their choice." *Gingles*, 478 U.S. at 49–50, 106 S.Ct. at 2766. These preconditions are:

1) the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single member district;

2) the minority group must be able to show that it is politically cohesive

3) the minority group must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed—usually to defeat the minority's preferred candidate.

The purpose of the first requirement is to determine whether "minority voters [would] possess the *potential* to elect representatives in the absence of the challenged structure or practice." *Gingles*, 478 U.S. at 50 n. 17, 106 S.Ct. at 2766 n. 17. As the *Gingles* court noted, because a minority population which is spread evenly throughout the district "cannot maintain that they would have been able to elect representatives of their choice in the absence of the multimember electoral structure," they cannot maintain that the multimember electoral system itself dilutes the voting strength of the minority voters. *Gin-*

*gles,* 478 U.S. at 50 n. 17, 106 S.Ct. at 2766 n. 17.

▇ Thus far, the Supreme Court has not spoken as to whether the *Gingles* analysis applies when a court is faced with a challenge to single member districts. District courts are divided on this issue with the courts in *Armour v. Ohio,* 775 F.Supp. 1044 (N.D.Ohio 1991), *Illinois Legislative Redistricting Commission v. LaPaille,* 782 F.Supp. 1272 (N.D.Ill.1992), and *Emison v. Growe,* 782 F.Supp. 427 (D.Minn.1992), *jur. noted,* — U.S. ——, 112 S.Ct. 1557, 118 L.Ed.2d 206, *motion gr.,* — U.S. ——, 113 S.Ct. 18, 120 L.Ed.2d 945 1992 U.S.LEXIS 3673 (1992) holding that the *Gingles* preconditions do not apply to a single-member district plan, and the courts in *Hastert,* 777 F.Supp. 634, and *DeBaca v. County of San Diego,* 794 F.Supp. 990 (S.D.Cal.1992) holding that they do.[17] We find the approach taken by *Hastert* and *DeBaca* to be persuasive and accordingly turn to examining the *Gingles* factors.

Of course, the effect of proving these three preconditions is an open question in this circuit. In *Solomon v. Liberty County, Florida,* 899 F.2d 1012 (11th Cir.1990) (en banc), *cert. denied,* 498 U.S. 1023, 111 S.Ct. 670, 112 L.Ed.2d 663 (1991) this circuit divided 5–5 as to the legal effect of proving the three *Gingles* factors. Because we find a Section 2 violation under either Judge Kravitch's or Judge Tjoflat's approach, the court need not address the conflict raised in *Solomon.* In other words, this court concludes that the plaintiffs have satisfied each of the three elements *Gingles* requires and that when considered together with the Senate factors, the "totality of the circumstances" show that with respect to Florida's Senate Plan, Hispanic and African–American vote dilution exists in Dade County in violation of § 2 of the Voting Rights Act. Additionally, under the totality of the circumstances, Hispanic vote

dilution exists in Dade County under Florida's House Plan.

### B. Application of the Gingles Factors

#### 1. *Sufficiently Large and Geographically Compact*

##### a. Sufficiently Large (Citizenship)

The *Gingles* court stated that in order to state a claim under Section 2, the minority group must show that it is sufficiently large to constitute a majority in a single member district. There is some dispute as to whether the term "majority" as used in *Gingles* refers to a numerical majority or a voting majority, and therefore, whether a court should focus on voting age population or total population as the measure of opportunity within a given district. *See Burton v. Sheheen,* 793 F.Supp. at 1354 (*citing McDaniel v. Mehfoud,* 708 F.Supp. 754, 756 (E.D.Va. 1989). Although the *Burton* court noted that the Ninth Circuit has held in *Garza v. County of Los Angeles,* 918 F.2d 763, 774–76 (9th Cir.1990), *cert. denied,* 498 U.S. 1028, 111 S.Ct. 681, 112 L.Ed.2d 673 (1991) that total population may be an adequate measure of minority opportunity,[18] it followed the holdings of both *McDaniel* and *McNeil v. Springfield Park District,* 851 F.2d 937, 944– 45 (7th Cir.1988), *cert. denied,* 490 U.S. 1031, 109 S.Ct. 1769, 104 L.Ed.2d 204 (1989) and concluded that "political opportunity is best measured in terms of minority voting age population." *Burton,* 793 F.Supp. at 1354.

▇ This court has previously indicated its view that the VAP is the relevant inquiry as concerns redistricting,[19] and we adopt the rationale and conclusion of the *Burton* court that voting age population (VAP) rather than total population provides a better measure of opportunity within a given district to elect a candidate of choice. Creating districts containing a bare majority VAP of minority groups such as African–Americans and His-

---

17. Other courts have held that these preconditions also apply to cases involving challenges to single-member districts. *See, e.g., Hastert v. State Bd. of Elections,* 777 F.Supp. 634, 639 (N.D.Ill. 1991) (three-judge court); *Gunn v. Chickasaw County,* 705 F.Supp. 315, 318 (N.D.Miss.1989); *McDaniels v. Mehfoud,* 702 F.Supp. 588, 591–92 (E.D.Va.1988).

18. *But. see Romero v. City of Pomona,* 883 F.2d 1418, 1426 (9th Cir.1989) (eligible minority *voters,* rather than total minority population, is the appropriate measure of geographical compactness).

19. Document 411 at 8; Tr. V–40.

panics, however, will not necessarily remedy a Voting Rights Act violation because, even if minorities constitute fifty percent of the overall population or voting age population in a district, they may not make up fifty percent of the voters. *See Ketchum v. Byrne,* 740 F.2d 1398 (7th Cir.1984), *cert. denied,* 471 U.S. 1135, 105 S.Ct. 2673, 86 L.Ed.2d 692 (1985) The court found in *Ketchum* that "minorities must have something more than a mere majority even of voting age population in order to have a reasonable opportunity to elect a representative of their choice." *Ketchum,* 740 F.2d at 1413. According to the experts, there are four key reasons why a supermajority of minority VAP is necessary to create effective minority districts:

(a) there are typically more *aliens* among minority (especially Hispanic) populations; (b) the *voting age population* is typically a lower proportion of the total population among minorities; (c) *registration* rates are often lower among minorities; and (d) *turnout* rates are often lower among minorities.

Kimball Brace, et al., *Minority Voting Equality: The 65 Percent Rule in Theory and Practice,* 10 Law & Policy 43, 47 (1988) (emphasis in the original).

An Hispanic supermajority of the VAP is necessary to account for the fact that many Hispanics are noncitizens and have lower voter registration rates. Document 438 (Congressional Opinion) at 16. This fact is not disputed by any party and is confirmed by the testimony of Dr. Moreno: "[t]he nature of tripartite politics in Dade means that only when Hispanics have a super majority can a Latin candidate win." Affidavit of Dr. Dario Moreno (document 471 at 27). Because the issues in this case were whether a fourth majority Hispanic Senate district and whether a tenth and eleventh majority Hispanic House district could be drawn in Dade County, much of the testimony revolved around what constituted a "supermajority" of Hispanic VAP sufficient to enable Hispanics to elect a candidate of their choice.

Much of the testimony addressed the "65 percent rule" and the impact of citizenship on the voting age population. The 65 percent rule states that "barring exceptional circum-stances, a district should contain a black [or Hispanic] population of at least 65 per cent (or a voting age population of at least 60 percent) to provide blacks [or Hispanics] with an opportunity to elect a candidate of their choice." Brace, *supra* at 44. The origin of this rule has been traced to the United States Supreme Court case of *United Jewish Organizations, Inc. v. Carey,* 430 U.S. 144, 97 S.Ct. 996, 51 L.Ed.2d 229 (1977) and has been subsequently addressed in *Ketchum* and *Neal v. Coleburn,* 689 F.Supp. 1426 (E.D.Va.1988). According to Kimball Brace, the foundation of the rule is suspect:

Legend has it that the rule came about because someone in the Justice Department took 50 percent and simply added 5 percent to compensate for the higher proportion of Hispanic noncitizens, 5 percent for lower Hispanic voting age population (VAP) and 5 percent for lower Hispanic registration and turnout.

Brace, *supra,* at 44.

In his testimony before the court in *Ketchum,* 740 F.2d at 1415, Mr. Brace stated the rule in a slightly different way:

[The 65 percent rule] is derived from the 50 percent total population, adding five percent for each of the three factors that are voting age population, because minorities tend to have a lower voting age population, lower registration patterns and a lower turnout pattern.

*In accord, Jeffers v. Clinton,* 756 F.Supp. 1195, 1199 (E.D.Ark.1990) (three-judge court), *aff'd,* 498 U.S. 1019, 111 S.Ct. 662, 112 L.Ed.2d 656 (1991) (citing *Smith v. Clinton,* 687 F.Supp. 1361, 1362–63 (E.D.Ark.1988) (three-judge court), *aff'd,* 488 U.S. 988, 109 S.Ct. 548, 102 L.Ed.2d 576 (1988)). Whereas in *Clinton* and *Ketchum,* Mr. Brace would supplement the 50 percent majority figure by five percent *each* for low voter registration and low voter turnout (for a total of ten percent), in his law review article, he would supplement the 50 percent majority figure by five percent *total* for low registration and turnout.

For this and other reasons, the 65 percent rule is not universally accepted by experts and has been modified or rejected by some

courts.[20] *See e.g.*, Tr. VI–6 (Dr. Weber). The court in *Rybicki v. State Board of Elections*, 574 F.Supp. 1147, 1149 (N.D.Ill.1983) stated that:

> The 65% figure is a general guideline which has been used by the DOJ reapportionment experts and the courts as a measure of the minority population in a district needed for minority voters to have a meaningful opportunity to elect a candidate of their choice. The 65% guideline, which the Supreme Court characterized as "reasonable" in [*Carey*], takes into account the younger median population age and the lower voter registration and turnout of minority citizens.

The court in *Coleburn* noted that

> [T]he general 65% guideline for remedial districts is not a required minimum which the plaintiffs must meet before they can be awarded any relief under § 2 of the Voting Rights Act. Rather, the 65% standard is a *flexible and practical guideline to consider* in fashioning relief for a § 2 violation.

*Coleburn*, 689 F.Supp. at 1438. The *Coleburn* court noted that the 65% figure is an "approximation of the type of corrective super-majority that may be needed in any particular case" which may have to be "reconsidered and adjusted in light of 'new information' and changing circumstances." *Coleburn*, 689 F.Supp. at 1438 (citing *Ketchum*, 740 F.2d at 1416 nn. 20, 21).

In his affidavit, Dr. Arrington indicates why he and other experts have modified the 65% rule insofar as it affects African–Americans:

> [B]ecause minority communities are now better organized and minority citizens more likely to register and vote than was true in an earlier era [,i]t is not always necessary to have a 60% [African–American VAP district] to assure blacks the opportunity to elect candidates of their choice. Although a 60% black VAP is probably still a good goal, 55% black VAP

is almost always enough for black citizens to have an opportunity to participate in the political process and elect candidates of their choice.

Affidavit II of Dr. Arrington (exhibit to document 474). The court in *Ketchum* similarly concluded that a 65% supermajority of African–American VAP might no longer be necessary to ensure African–Americans a chance to elect a candidate of their choice and advised district courts to reconsider that figure in light of new information and statistical data:

> For example, we note that the Rev. Jesse Jackson's 1984 presidential candidacy has apparently stimulated black registration and turnout nationally. More specific to Chicago, we understand that the November 1982 gubernatorial election in Illinois and the 1983 Chicago mayoral election indicated a marked increase in black registration and turnout. If these and other elections should demonstrate a significant and consistent change in voting behavior in Chicago applicable to aldermanic elections, there would have to be a corresponding change in redistricting practices and legal standards[.]

*Ketchum*, 740 F.2d at 1416 n. 21.

The testimony in this case also showed that African–Americans turn out in much higher rates than Hispanics. Tr. VI–282–83 (Lisa Handley).

The effectiveness of the African–American majority districts created by the Florida House and Senate plans is not in dispute. The African–American VAP in these districts ranged from 50.96% to 57.24% in the House districts and from 51.7% to 52.5% in the Senate and no party has attempted to argue that these districts would not result in an African–American candidate of choice being elected.[21] Thus we find that a district with an African–American majority VAP is an effective district which gives Afri-

---

**20.** While some experts, such as Dr. Arrington, would still attempt to create Hispanic districts containing Hispanic VAPs of 65%, Affidavit of Dr. Arrington (Exhibit to document 474 at 6), other experts, such as Dr. Weber, would not.

**21.** There was testimony that because districts containing a simple majority of African–American VAP would elect an African–American candidate of choice, districts containing 57 or 58 percent African–American VAP are designed to waste African–American votes and are, therefore, "packed." Tr. VI–135–36.

can–Americans a potential for electing candidates of their choice. Accordingly, the NAACP's proposed three African–American districts satisfy the "sufficiently large" requirement. The only question, therefore, is whether the VAP in the proposed one additional Hispanic Senate district and two additional Hispanic House districts would enable Hispanic voters in these districts to elect candidates of choice without impairing the VAPs in the surrounding 3 Hispanic Senate and 9 Hispanic House districts.

Plaintiffs' own witness testified that an Hispanic Senate district containing 55% Hispanic VAP [22] would be "problematic" inasmuch as the VAP would be too low to guarantee that the district would result in the election of the Hispanic candidate of choice. Tr. II–66. Plaintiffs submitted evidence, however, that a district containing 59 percent Hispanic VAP *would* enable Hispanics to elect a candidate of choice.[23] Specifically, Dr. Lichtman testified that

> Once the Hispanic concentration reaches a certain point, then all those districts seem to elect Hispanics, but below that given point, none of the districts seem to elect Hispanics.... [N]o candidate of choice of the Hispanic ... has been elected in districts below a 59 percent Hispanic level, and in districts at 59 percent and above, those districts have in every instance elected Hispanic candidates

Tr. III–24. Dr. Lichtman concluded that the Hispanic VAP of 62.1 percent in district 40 provided Hispanics a "realistic opportunity" to elect a candidate of choice in that district.[24] Tr. III–30, 67–8. Dr. Lichtman's assessment included adjusting for the lower Hispanic voter turnout. Declaration of Dr. Allan J. Lichtman at 2. Although Dr. Lichtman had previously recommended to the Dade County commission that they attempt

to create "rock solid" majority Hispanic districts containing 65% Hispanic VAP and "rock solid" majority African–American districts containing 55% African–American VAP, these districts were created "for an entirely different purpose" and he "erred on the side of making sure that [these] seats would be safe." Tr. III–94, III–233. He then reaffirmed his conclusion that "a 62 percent district, while not an absolute lock ... certainly comes well within the range to provide Hispanic voters a realistic potential to elect candidates of their choice." Tr. III–94.

Defendants, on the other hand, submitted evidence that after accounting for the lower level of citizenship for Hispanics, some of the newly created Hispanic districts would not be effective. In other words, although the Hispanic VAP might indicate that these districts would tend to elect a Hispanic candidate of choice, because the number of Hispanic *citizens* (as opposed to voting age residents) did not constitute a majority, Hispanics would not be able to elect a candidate of choice without relying on a certain percentage of white-crossover votes. According to defendants, the creation of these two additional Hispanic districts would do nothing more than dilute the Hispanic citizen VAP in the remaining nine districts and would result in a decrease in safe Hispanic districts.

In support of their argument, defendants cite De Grove's testimony that after adjusting for citizenship, a district containing 66% Hispanic VAP would have less than 50% Hispanic voters.[25] Tr. VII–26, 29. Defendants further note that citizenship levels vary among Hispanic districts—older, settled Hispanic neighborhoods in the central part of the city will have higher citizenship levels than the neighborhoods which attract more

---

**22.** District number 35 in the De Grandy Senate plan.

**23.** Javier Souto had repeatedly been reelected in a district containing 59% Hispanic VAP. Tr. II–153.

**24.** The fourth proposed Hispanic district in the De Grandy plan contained 55% Hispanic VAP. The De Grandy plaintiffs seemed to agree that the Reaves/Brown plan (where the fourth pro-

posed Hispanic district contained 62.1% Hispanic VAP) would be more effective.

**25.** De Grove testified that 32% of the population (Anglo, African–American and Hispanic combined) in Dade County are not citizens. Tr. VII–20–1. Furthermore, he testified that in a hypothetical tract containing a 100% Hispanic population, 55% of the tract's population would be non-citizens. Tr. VII–23.

recent arrivals.[26] Tr. VII–49. Whereas according to Dr. Weber, Cubans have a higher citizenship rate than other groups, Tr. V–26, Dr. Moreno testified that due to the high number of recent Hispanic arrivals tending to settle in the South Beach area, there was a "higher level of [Hispanic] non-citizenship and a higher level of [Hispanic] non-registration" in South Beach than in other areas of the city. Tr. II–72–73. Because of this, plaintiffs' proposed 35th Senate district would not be an effective district. Tr. II–72. Plaintiffs responded by noting that their proposed 35th district does not consist entirely of South Beach; rather, the lack of Hispanic citizens in South Beach is balanced by the highly concentrated Hispanic areas of Little Havana.

Defendants also argued that plaintiffs were changing their position. According to defendants, in the congressional redistricting hearings, plaintiffs had contended that a 65% supermajority was necessary for Hispanics to elect a candidate of choice, but now they contend that a 59% or 62% supermajority would allow them to do so. Plaintiffs explained that the reason why plaintiffs advocated such a high VAP for the Hispanic congressional districts was because only two districts were being formed.[27] Because everyone agreed that only two Hispanic districts would be drawn, "it ma[de] sense to hedge your bet and make those districts as Hispanic as possible." Tr. II–115. *See also* Tr. II–67–8. Furthermore, according to Dr. Arrington, a higher minority VAP is necessary for congressional districts to perform than for state legislative districts to perform:

> One would certainly want a somewhat higher black VAP for Congressional districts than for the state legislature because of the greater organization and financing necessary to conduct a campaign at that level.

Arrington Aff. at 6. Although his analysis specifically applies only to African–Americans, there is no reason to suspect it would not also apply to Hispanics.

The court finds that because minority groups have a younger population than majority groups, a supermajority of Hispanic and African–American total population is necessary in order to create an opportunity for these groups to elect candidates of their choice. Because Hispanics communities are characterized by a large number of non citizens and a lower voter registration and turnout rates, a supermajority of Hispanic VAP is necessary to create districts in which Hispanics can elect candidates of choice. Like Hispanics, African–Americans must also constitute a supermajority of the total population of the district in order to elect a candidate of choice; however, because of the recent increase in African–American turnout and registration, a supermajority of African–American VAP is not necessary in order to elect an African–American candidate of choice. Furthermore, although the court finds that both a supermajority of Hispanic and African–American total population and a supermajority of Hispanic VAP are necessary, we decline to express these requirements as exact percentages.

The court further finds that both the Senate districts proposed by plaintiff-intervenors Reaves/Brown/Hargrett and the House districts proposed by the De Grandy plaintiffs would create districts containing effective Hispanic voting majorities. Each of the proposed Senate districts in the Reaves/Brown plan and House districts in the De Grandy plan contains an Hispanic VAP of at least 60%. Because the 65 percent rule already accounts for citizenship, making another adjustment for citizenship would overstate its importance and lead to double counting.[28]

---

26. Although it would be possible to estimate the citizenship levels on a tract by tract basis, the smaller sample size (district versus county) would present statistical problems. Tr. VII–52.

27. In our order dated May 29, 1992, however, this court found that a supermajority was necessary. The congressional inquiry was different from the inquiry in this Section 2 case because in the former, we were merely "considering" Sec-

tion 2 when formulating districts, while here we are presented with a specific challenge to the Florida plan.

28. Specifically, the 65 percent rule is premised on the fact that many Hispanics are non-citizens and have lower voter registration and turnouts. If this were not the case, there would be no reason to create districts containing more than 50.1% Hispanic VAP. No one disagrees that

Finally, the fact that the plaintiffs themselves are satisfied with these percentages also tends to indicate the effectiveness of the proposed districts. *Coleburn,* 689 F.Supp. at 1438.

### b. Geographical Compactness

█ Plaintiffs have shown that the Dade County's Hispanic population is sufficiently large and geographically compact to constitute a majority in four Senate and eleven House districts. Hispanics constitute nearly one million persons in the Dade County area, and the county has sufficient concentrations of Hispanic population that can be easily combined to create four Senate and eleven House districts that contain effective Hispanic voting majorities. Hispanics have primarily settled in three sections of Dade: the Little Havana section of the City of Miami, the "West Dade area" comprising the communities of Sweetwater, Village Green, Westchester and West Kendall, and the Northwest section of the county consisting of the cities of Hialeah, Miami Springs, and their surrounding neighborhoods. Moreno Aff. at 5–6. There is also a sizeable Hispanic (mostly Mexican) farm-worker community in the Homestead area. Document 471 at 5–6. The Cuban migration patterns went from east to west—as Cubans improved economically, they moved out of the Little Havana area into the suburbs. Tr. III–12. With the exception of the Miami airport, which separates Little Havana from Hialeah and Miami Springs, the Hispanic population forms a compact and contiguous line from Hialeah to Kendall. Tr. III–13. The two most dramatic areas of Hispanic growth in Dade County area along Miami Beach [29] and the Kendall/West Kendall area. Tr. II–14.

The African–American population is also sufficiently large and geographically compact

to constitute a majority in two Senate and four House districts in Dade County.[30] The concentrations of the African–American population essentially rest in the north central portion of urbanized Dade County including Opa–Locka, Liberty City and Carol City. Tr. VI–205; II–15–16. There are also pockets of non-Hispanic African–Americans in downtown Miami (including Overtown), Coconut Grove, and Richmond Heights. Tr. II–16; VI–205. Finally, there are African–American neighborhoods in Florida City, Homestead, Goulds, and South Miami. Tr. II–16. The Allapattah area is the border zone between African–American neighborhoods (to the east) and Hispanic areas (to the west). Tr. II–15.

The court in *Hastert v. State Bd. of Elections,* 777 F.Supp. 634 (N.D.Ill.1991), noted that the *Gingles* geographical compactness requirement is not "an aesthetic concept." *Hastert,* 777 F.Supp. at 649. In that case, most of Chicago/Cook County's Hispanic population was "clustered into two dense enclaves, one on Chicago's near northwest side and the other on the near southwest side," but that the two enclaves were "less than a mile from each other at their closest points." *Hastert,* 777 F.Supp. at 649. Concluding that Chicago's Hispanic community was geographically compact within the meaning of *Gingles* despite the fact that the clusters were separated, the court held that "[t]he separation of /clusters is not indicative of the existence of two distinct communities, but appears to have occurred as a result of exogenous physical and institutional barriers." *Hastert,* 777 F.Supp. at 649. Despite the fact the Hispanic community existed in two separate enclaves, the court in *Hastert* concluded that the Chicago/Cook County Hispanic community was sufficiently large and geographically compact to constitute a

---

because of the lower citizenship and registration/turnout rates, Hispanic districts must contain a supermajority of Hispanic VAP. As previously stated, the 65 percent rule was "arbitrarily" created to account for these problems. Thus, this court must either (1) accept or modify the 65 percent rule or (2) formulate its own methodology for estimating the number of non-citizens reflected in the Hispanic VAP for the various districts. Because each of the districts contains a 60% Hispanic VAP and, therefore, "satisfies" the 65 percent rule, the court need not further in-

quire as to the Hispanic citizenship levels in each proposed district.

**29.** In 1980, Miami Beach was 30 percent Hispanic. In 1990, it is 49 percent Hispanic. Tr. II–14.

**30.** The African–American population can also support another majority district in Broward/Palm Beach counties.

single district majority. *Hastert*, 777 F.Supp. at 649.

Other courts have echoed the fact that compactness is not an aesthetic concept. In *Dillard v. Baldwin County Board of Education*, 686 F.Supp. 1459, 1465–66 (M.D.Ala. 1988), the court held that "[a]n aesthetic norm, by itself, would be not only unrelated to the legal and social issues presented under Section 2, it would be an unworkable concept, resulting in arbitrary and capricious results, because it offers no guidance as to when it is met." The court in *Wilson v. Eu*, 1 Cal. 4th 707, 4 Cal.Rptr.2d 379, 823 P.2d 545 (1992), held that the compactness requirement should be used to promote the creation of functional voting districts that allow for effective representation. Specifically, the court held that

> Compactness does not refer to geometric shapes but to the ability of citizens to relate to each other and their representatives and to the ability of representatives to relate effectively to their constituency.

*Eu*, 4 Cal.Rptr.2d at 387, 823 P.2d at 553.

In this case, plaintiffs testified that the primary difference between their House plan and the Florida House plan was that the De Grandy House plan attempted to draw the Hispanic districts from north to south while the state drew the districts from east to west. Tr. IV–22. The De Grandy/Reaves/Humphrey plaintiffs and the DOJ argue that Florida's House plan fragments and dilutes the Hispanic vote. Dr. Moreno testified that House District 116 of the Florida plan has an Hispanic VAP of 48 percent. Tr. III–263. Additionally, Dr. Moreno pointed out that the line of District 116 separates heavily Hispanic neighborhoods in District 112 from the rest of the heavily hispanic Kendall Lakes area and the Kendall area. Tr. III–263–264. Dr. Moreno concluded that the Florida plan erects a barrier between "neighbors making up the same, basically what is the same housing development in Kendall Lakes." Tr. III–264. Additionally, Dr. Moreno testified that in order to protect a white incumbent the Florida plan packs District 114 with an Hispanic VAP of over 78 percent. Tr. III–265. Dr. Moreno also pointed out that in District 102 and District 109 the State repeated the process of fragmenting Hispanic communities. Tr. III–265. This court does not find that the districts drawn by the De Grandy plaintiffs are significantly less geographically compact than those drawn by the state of Florida.[31] Nor are these districts "so unreasonably irregular, 'bizarre,' or 'uncouth' as to approach obvious gerrymandering." *Coleburn*, 689 F.Supp. at 1437. Furthermore, these districts are "relatively compact and are in line with the configuration of electoral districts that have been approved in other cases." *Coleburn*, 689 F.Supp. at 1437 (*citing Rybicki v. State Board of Elections*, 574 F.Supp. 1082, 1146, 1166–67 (N.D.Ill.1982) (three judge court)). Finally, the court finds that the districts as drawn in the De Grandy House and Senate plans would create functional voting districts that allow for effective representation.

### 2. *Political Cohesiveness*

The testimony showed that the Hispanics and African–Americans were each politically cohesive among themselves but were not at all cohesive—and were often at odds—in relation to each other. *See e.g.* Tr. III–35–36; *Meek v. Metropolitan Dade County*, 908 F.2d 1540, 1545–46 (11th Cir.1990). There is a high degree of tension in Dade County between the African–American population and the Hispanic population. Tr. II–82. Furthermore, while African Americans tend to vote Democratic, Hispanic voters tend to vote Republican. Tr. II–28. The focus of this *Gingles* prong, however, is *not* the joint cohesiveness of two separate minority groups, but rather whether "Hispanics" as a

---

31. As the court in *Jeffers v. Clinton*, 730 F.Supp. 196, 207 (E.D.Ark.1989), stated:

> [S]ome of the districts [proposed by the plaintiffs] look rather strange, but we do not believe this is fatal to plaintiffs' position. Their alternative districts are not materially stranger in shape than at least some of the districts contained in the present apportionment plan. The one-person, one-vote rule inevitably requires that county lines and natural barriers be crossed in some instances, and that cities and other political and geographic units be split in others.

group and/or "African–Americans" as a group are politically cohesive.

### a. Hispanic

■ The total Hispanic population of Dade County is 953,407 of which 55 percent is Cuban American. Moreno Aff. at 5. It is estimated that during the 1980's, over 300,-000 Latin Americans moved into Dade County. Moreno Aff. at 5. Of these, the Mariel boatlift in 1980 brought in 125,000 Cuban refugees, while Nicaraguans fleeing the Sandinista regime and civil war in 1986 and 1987 numbered approximately 79,000 [32]. Tr. II–17. Thousands of Colombians, Peruvians, Hondurans, Guatemalans and Puerto Ricans also melded into Dade's flourishing Hispanic community during the 1980s. According to the 1990 census, non-Cuban hispanics account for 40.7% of the Hispanic voters in Dade County. Tr. II–86.

The testimony showed that there is a high degree of political cohesiveness among Cuban voters in Dade County although the testimony was less clear about the cohesiveness of non-Cuban Hispanics. Because Dr. Moreno focused on Hispanics as a group and not on the individual Hispanic subgroups, he was not able to form any conclusions as to voting preferences of these individual subgroups [33]. Tr. II–84–91.

In general, "the Hispanics in Dade County are distinguished from Hispanics in the other part of the country by being more conservative and much more Republican." Moreno Aff. at 16. The strong loyalty Cuban–Americans have to the Republican party is seen by their voting patterns in several elections. In 1986, Republican Bob Martinez carried the Hispanic precincts of Dade over his Democratic opponent, receiving 79 percent of the vote. Moreno Aff. at 17. In 1988, President George Bush carried the Hispanic precincts of Dade County with over 85 percent of the vote, while Senator Connie Mack carried the same districts with about 80 percent of the vote. Moreno Aff. at 16. Between 1980 and 1990, Democratic party registration among Hispanics in Dade County decreased from 49 to 24 percent, while Republican registration increased from 39 to 68 percent. Moreno Aff. at 18. The Cuban vote stands in stark contrast to that of other Latinos across the United States who have consistently supported the Democratic ticket by two-to-one margins. Moreno Aff. at 18. The cohesiveness of Dade's Hispanic community has also been buttressed by the idealogical affinity of its two largest groups—Nicaraguans and Cubans. Moreno Aff. at 9. These two groups continually work together for a conservative foreign policy agenda. Moreno Aff. at 9; Tr. II–18. According to Representative Miguel De Grandy,[34]

> There is a union between Cuban–Americans, Nicaraguans and other Central Americans in basic philosophy, first to form policy because ... they are basically political and not economic migrations, unlike other Hispanic sectors of the United States; they generally have a very conservative, very anti-communist political philosophy on the foreign affairs.

Tr. II–145.

Dade County has a significant amount of Hispanic African–Americans including immigrants from the Dominican Republic and Puerto Rico.[35] Tr. II at 33. Although Dr. Moreno testified that Dominicans identified more with the Hispanic culture than that of the African Americans, the cohesiveness of the 70,000 Dade County Puerto Ricans is less clear. Moreno Aff. at 33. According to Dr. Moreno, Dade County Puerto Ricans seem to identify with the language minority stronger than with the racial minority. Tr. II–33, 84–85. Furthermore, Dade County Puerto Ricans tend to be more Republican and more conservative than their Puerto Rican coun-

---

**32.** According to Dr. Moreno, this number is believed to be undercounted by 30,000.

**33.** It was unclear whether this data is not available or if the appropriate analysis was not done. Tr. II–112.

**34.** Mr. De Grandy is not testifying as an expert.

**35.** This is significant, for example, in the 36 district where the non-Hispanic African American VAP is 49%, but the total African–American VAP is 52%. Thus, there is approximately three percent Hispanic African–American VAP in this district.

terparts in New York.[36] Tr. II–17. Nonetheless, the statistical evidence shows that Puerto Ricans tend to register more as Democrats (50%) than Republicans (40%). Tr. II–142, 179. According to Dr. Moreno, the fact that Puerto Ricans and Cubans do not share the same party affiliation does not mean that the two groups are not cohesive; rather, Hispanic Democrats tend to vote for Hispanic Republicans when they have that opportunity. Tr. II–103.

According to Representative De Grandy, the various Hispanic groups tend to have very similar views in the areas of education, housing, medically needy programs among others. Tr. II–145–6. Furthermore, the various Hispanic groups tend to have the same political philosophy in areas such as civil rights and discrimination. These groups have united to actively oppose the English only initiative. According to Dr. Moreno, "[t]he fear of language based discrimination [both in the form of English only initiatives and otherwise] has served to united Dade's Hispanic communities." Moreno Aff. at 7.

We conclude that there is a sufficient degree of political cohesiveness among Hispanics to satisfy the second *Gingles* prong, although there might be differences between the several Hispanic subgroups.

### b. African–Americans

All of the evidence indicated that Dade County's African–American community is cohesive. Dr. Weber testified that African–Americans are "generally" cohesive and tend to vote for Democratic candidates in general elections. Tr. VI–142. Dr. Lichtman similarly testified that "blacks are politically cohesive, ... unite in large numbers behind candidates of their choice and ... prefer to elect black candidates when there are elections with black candidates competing

against candidates of other races." Tr. III–35. Both this court and Florida Supreme Court Chief Justice Leander Shaw have previously held that the approximately 590,000 African–American residents in the Broward/Dade/Monroe county area[37] are politically cohesive[38]:

> Black voters in Florida generally vote as a cohesive racial block for the black candidate when there is a black versus white choice on the ballot for a given office.

Document 411 (Report of Special Master) at 23. *See also In re SJR 2G,* 597 So.2d at 290 (Shaw, C.J., dissenting); document 388 (Report of Independent Expert to Special Master) at ¶ 10. Furthermore, the testimony received in the legislative hearings underscore this conclusion. Accordingly, we conclude that both African–Americans and Hispanics are politically cohesive groups within the meaning of the second *Gingles* prong.

### 3. White Block Voting

Dr. Allan J. Lichtman,[39] defines "racially polarized voting" as "the extent to which members of distinct racial or ethnic groups support different candidates of their choice." Affidavit of Dr. Lichtman, Government Exhibit 46 at ¶ 4; Tr. III–13. Racially polarized voting can be subdivided into two parts: minority cohesion, which is the extent to which minority voters support candidates of their choice, and white bloc voting, which is the extent to which whites support different candidates. Government Exhibit 46 at ¶ 4. According to Dr. Lichtman, "[r]acially polarized voting is politically significant if, under a given electoral system, it impedes the opportunities for minority voters to elect candidates of their choice." Government Exhibit 46 at ¶ 4.

There was a substantial amount of testimony—both during the Congressional redis-

---

**36.** In fact, "[a]ll the Hispanic ethnic groups by nationality tend to be more conservative than their counterparts in other large U.S. metropolitan areas." Tr. II–18.

**37.** Affidavit of Thomas B. Hoeffler, document 472 at 8.

**38.** African–American registration in Dade County is 90 percent Democrat. Moreno Aff. at 19. "The antipathy of Black voters to Republican

candidates is illustrated in recent presidential and state-wide races [where] no GOP candidate received more than 12 percent of the Black vote." *Id.* African–Americans also vote heavily for Democrats in state legislative elections. *Id.*

**39.** Dr. Lichtman is a professor of history and formerly Associate Dean of the College of Arts and Sciences at The American University in Washington, D.C.

tricting hearings and the state legislative hearings—that voting in Dade County is racially polarized. The court notes Chief Justice Leander Shaw's conclusion in *In re Constitutionality of Senate Joint Resolution 2G Special Apportionment Session 1992*, 597 So.2d 276, 290 (Fla.1992) (Shaw, C.J., dissenting) that "[t]he results of Florida's legislative elections over the past ten years established the presence of racially polarized voting." Likewise, Dr. Arrington stated that "most elections involving both Afro–Americans and Hispanics are racially polarized." Arrington Aff. at 1. Furthermore, according to Dr. Lichtman

> The results reported in Table 1 [exhibit to government exhibit 46] show a clear pattern of racially polarized voting, Hispanic cohesion, and white bloc voting. It also shows that black voters united with white voters in opposition to Hispanic candidates for Senate and House positions[40].... The results reported in Table 1 likewise show a pattern of strong bloc voting by whites for non-Hispanic candidates [ ... and] indicate that blacks joined with whites in opposing Hispanic Senate and House candidates.... These findings of Hispanic cohesion and white bloc voting are supported by the analyses of additional local elections in Dade County.

Lichtman Aff. at ¶¶ 6–9; *See also* Tr. III–18–19.

Furthermore,

> The high degree of racially polarized voting documented for legislative elections in Dade County indicates that Hispanic voters would have an opportunity to elect candidates of their choice only in Districts with Hispanic voting-age majorities. Otherwise white bloc voting would usually be sufficient to defeat the candidate of choice of Hispanic voters.

Lichtman Affidavit at ¶ 10. Finally, the reports prepared by consultants for the state also recognize that because of the strong polarization between Hispanics and non-His-

panics in Dade County, opportunities for Hispanics to elect candidates of their choice are impeded. Lichtman Aff. at ¶ 11.

According to Dr. Moreno, Dade County is profoundly divided by the competing interests of three distinct and separate ethnic groups—African American, Hispanic, and Non–Hispanic White—each of whom has different social and economic interests. Moreno Aff. at 3. According to Dr. Moreno, "[t]he division of Dade along ethnic lines has made Miami the contemporary symbol of racial upheaval in America." Moreno Aff. at 3. There is a "high degree of tension in Dade County between the Afro–American population and the Hispanic population." Tr. II–82. Furthermore, the division of the three major ethnic groups has led to the development of tripartite politics in Miami; that is, ethnic factors between the three communities predominate over all other factors in Dade politics.

According to Dr. Moreno, "[m]inorities are usually only able to elect their candidates when they are firmly in the majority." Moreno Aff. at 20. Furthermore, "white candidates are aided by the deep cleavages between Republican Hispanics and Democratic Blacks." Moreno Aff. at 3. According to Dr. Moreno, there are four types of racially polarized elections in Miami:

> First, [there] are races featuring a Hispanic candidate versus a White candidate with Black[s] supporting the White candidate; Second, a Black candidate versus a White candidate with Hispanic voters supporting the White candidate; third, a Black candidate versus a Hispanic candidate with White voters holding the balance of power, and finally the[re] are races between two candidates of the same ethnic group in which voters from the other two group[s] support the least ethnic of the two candidates.

Moreno Aff. at 21.

Dr. Moreno cites specific examples of recent races in which ethnic factors predomi-

---

**40.** "In every election studied, Hispanics voted for Hispanic candidates in greater proportion than either whites or blacks. The results reported in Table 1 show a pattern of strong political cohesion. By generally overwhelming majorities, Hispanic voters preferred to elect Hispanic can-

didates to state legislative positions. In 11 of 13 elections for the Senate of House, ecological regression results show that more than 75 percent of Hispanic voters opted for the Hispanic candidates." Government Exhibit 46 at ¶ 6.

nated over all others including the congressional race between Gerald Richman and Ileana Ros–Lehtinen where "[t]he campaign strategies of both campaigns were based purely on ethnic calculations." Moreno Aff. at 23. Cuban–Americans, offended by the perceived racism of Richman, voted for Ros–Lehtinen by a margin of 88 to 12 percent. Although Richman carried all of the other blocs of voters—Jewish, Anglo, and Black— because these voters represented only 47 percent of the electorate, Richman lost the race. According to Dr. Moreno, "Ros–Lehtinen won simply because more Cubans voted and almost all of them voted for Ros–Lehtinen." Moreno Aff. at 24.

In 1990, two Hispanic incumbents almost lost their seats in the state legislature to non-Hispanic White challengers. Moreno Aff. at 26–27. Javier Souto was barely re-elected to the State Senate from the 40th district when Tom Easterly won 74 percent of the non-Hispanic White vote and 92 percent of the Black vote.[41] Moreno Aff. at 26–27. Souto was able to defeat his Anglo opponent by winning over 80 percent of the Hispanic vote. State Representative Al Gutman also nearly lost his 105 district seat to a non-Hispanic White candidate. His challenger, Steve Leifman, won 42 percent of the vote in this heavily Hispanic district by carrying two-thirds of the non-Hispanic White vote and 83 percent of the African–American vote. Gutman survived by winning 92 percent of the Hispanic vote. In another race, Hispanic challenger Orlando Cruz was easily defeated by incumbent Art Simon in an ethnically polarized election in the 116th District despite the fact that Cruz carried 77 percent of the Latin vote. Moreno Aff. at 26–27; Tr. II–109. According to Dr. Moreno, "this pattern of ethnic polarized voting against Hispanics was not restricted to the 1990 elections." Moreno Aff. at 27. Rather, "[t]he pattern of bloc voting by non-Latin Whites and Blacks against Hispanics is found in elections at all levels against both Latin challengers and incumbents." Moreno Aff. at 27.

African–Americans have also been the victims of block voting. According to Dr. Moreno, "Black candidates faced with a White-Hispanic coalition and lacking adequate finances have largely been limited to running in the three state House districts (106, 107, 108) and in the one state Senate district (36) where Blacks comprised an overwhelming majority." Moreno Aff. at 28. In 1986, Bob Starks, a White Republican, barely beat Nathaniel Edmond, an African–American Democrat in the general election for state House district 118. Despite the fact that Democrats out-registered Republicans in this district 21,202 to 9,968, Stark won by carrying nearly all of the White votes in the district. This occurred despite the fact that Edmond had the support of almost all of the African–American voters.[42] In 1990, Darryl Jones, a African–American Democrat won the election despite losing the white vote. Jones beat John Minchew 64 to 36 percent because more African–Americans turned out at the polls and he carried enough of the White vote (24 percent) to put him over the top. Moreno Aff. at 29. According to Dr. Moreno, block voting is not limited to legislative races, for "Black[ ] candidates have also fared poorly in seeking county-wide office." Moreno Aff. at 29.

### 4. *Additional Findings*

The history of discrimination against African–Americans in Florida was addressed in depth in our order of May 29, 1992 and will not be restated here. *See* document 438 at 2–3. The court also finds sufficient evidence of language based discrimination against Dade County Hispanics. According to Dr. Moreno, "[t]he fear of an anti-Spanish backlash has been reinforced by English only initiatives, at both the county and state level, which seem to be specifically aimed at Miami's Latin population." Moreno Aff. at 7. In his affidavit, Dr. Moreno also cites specific

---

41. In his live testimony, Dr. Moreno stated that even fewer African–Americans crossed over (3.7%). Tr. II–95.

42. Although blacks comprise only 29 percent of the population of this district, they exert greater influence because most of the Hispanics in this district are not United States citizens. Thus, African–Americans represent over one third of the registered voters in this district.

examples of language based discrimination including the suspension of a supermarket clerk for speaking Spanish in front of customers and the refusal of a personnel agency to refer people with foreign accents to job openings at a Miami bank. Moreno Aff. at 8–9.

The record clearly established that Florida's minorities have borne the social, economic and political effects of this discrimination. This is true despite the fact that Cubans have fared relatively well in South Florida. Although Miami has a Cuban mayor and South Florida is the home of three Cuban state senators, Tr. II–101, language based discrimination still exists in South Florida. While the witnesses disagreed as to whether Hispanics or African–Americans bore more of the brunt of discrimination, everyone agreed that both groups had suffered.[43] In fact, as a result of this discrimination, the United States DOJ must preclear five Florida counties pursuant to Section 5 of the Voting Rights Act, as amended. Section 1973 *et seq.* Those counties are Collier, Hardee, Hendry, Hillsborough and Monroe.[44]

In this case, the DOJ and the De Grandy/Reaves/Humphrey plaintiffs have established that Florida's Senate reapportionment plan dilutes the voting strength of Hispanics in Dade County and the surrounding areas. Additionally, plaintiff NAACP has established that Florida's Senate reapportionment plan dilutes the voting strength of African–

Americans in Dade County and the surrounding areas. With respect to Florida's House reapportionment plan, all of the parties have agreed that Florida's plan fragments the African–American community in Escambia County.[45] The DOJ and the De Grandy/Reaves/Humphrey plaintiffs have also established that Florida's House reapportionment plan dilutes the voting strength of Hispanics in Dade County. We must now fashion a remedy.

## III. REMEDY

### A. The Senate

■ Florida's new Senate plan (Plan 330) creates five minority-majority districts of which two have African–American voting age population (VAP) majorities and three have Hispanic VAP majorities. The three Hispanic VAP majority districts and one of the African–American VAP majority districts are contained wholly within Dade County. The other African–American VAP majority district is contained in the South Florida counties of Broward and Palm Beach. In the three Hispanic VAP majority districts, Hispanics constitute the following percentages of the VAP: (1) District 34—66.3 percent; (2) District 37—64.3 percent; and (3) District 39—76.1 percent. African–Americans constitute 52.5 percent of the VAP of District 36 in Dade County, and 51.7 percent of the VAP in the Broward/Palm Beach district, District 30.

---

43. Representative Burke felt that African–Americans have suffered greater discrimination than Hispanics. Tr. VII–126. Dr. Weber similarly testified that "African–Americans have had greater difficulty than Hispanic Americans" in achieving political empowerment in South Florida. Tr. VI–145. Likewise, Dr. Moreno testified that

> Blacks are also the most disadvantaged of the three major ethnic groups that live in the Greater Miami area. In all social-economic indicators[,] Afro–Americans are the worst off of Dade [C]ounty's citizens.
> ... Miami's Black community facing discrimination, poverty, and not participating in local decision-making has erupted in violence four times during the 1980's.

Moreno Aff. at 11–12. Plaintiff Darryl Reaves testified that there was discrimination against both Cubans and African–Americans and could not state which group has been most victimized. Tr. V–132.

44. These five counties are subject to the Section 5 preclearance requirement because they provided election information only in the English language when more than five percent of the voting age citizens were Spanish-speaking, and fewer than fifty percent of them were registered to vote or voted in the 1972 Presidential Election. *See* 41 Fed.Reg. 34329 (August 13, 1976); 40 Fed. Reg. —— (September 23, 1975).

45. All plaintiffs and the defendants agreed that voting is racially polarized in Escambia County, and that the African–American population in Escambia County is large, compact, and concentrated in the Pensacola area. Additionally, the parties agreed that Florida's House plan split the politically cohesive community in Escambia County into several districts. Thus, the parties agreed to a consent judgment which formulated new House districts in the Escambia County area uniting the African–American population of the Pensacola area. (Doc. 548).

The Senate reapportionment plan creates seven Dade County districts of which five districts are wholly within Dade County and two additional districts are comprised of portions of Dade County and the surrounding areas.

The DOJ and the De Grandy/Reaves/Humphrey plaintiffs take exception to Florida's Senate reapportionment plan as it pertains to Dade County because the state's proposed plan fragments the Hispanic population concentrations such that Hispanics comprise a majority of the VAP only in three districts. Specifically, the DOJ and the De Grandy/Reaves/Humphrey plaintiffs point out that as a result of Florida's Senate reapportionment plan 28.55 percent of the Hispanic population of Dade County will reside in state Senate districts that Hispanics will have no possibility of winning. *See* Moreno Aff. at 32–38. The DOJ and the De Grandy/Reaves/Humphrey plaintiffs contend that if the racial and ethnic population concentrations existing in the Dade County area are divided into equally populated Senate districts which respect communities of interest and follow other non-discriminatory plan drawing criteria, Hispanics would constitute a significant voting age majority of the population in an additional Senate district. In our order dealing with congressional redistricting, we held that "the voting age population (VAP) is the relevant number to be used in determining whether minorities in a particular district will be able to elect a candidate of their choice." *De Grandy v. Wetherell,* Nos. TCA 92–40015–WS, 92–40131–WS, slip op. at 16 (N.D.Fla. May 29, 1992) (citing *Solomon,* 899 F.2d at 1018). The court in *Ketchum* explained that VAP is the best measure of minority voting strength because age is a legal prerequisite to voting and minority groups generally have a younger population which comprise a large proportion of the individuals who are ineligible to vote. *Ketchum,* 740 F.2d at 1412–1413. Because minority groups generally have a younger population than majority groups, the use of VAP as the relevant number for creating minority-majority districts requires that minority groups constitute a supermajority of the total population of an electoral district. *See Ketchum,* 740 F.2d at 1412–1413.

Additionally, our congressional order held that "because Hispanic communities are characterized by a large number of noncitizens and lower voter registration rates, a supermajority of the VAP is necessary to create districts in which Hispanics can elect candidates of their choice." *De Grandy,* Nos. TCA 92–40015–WS, 92–40131–WS, slip op. at 16. In determining whether a fourth district can be created in which Hispanics constitute a supermajority of the VAP, we must consider "emerging changes in sociological and electoral characteristics of minority groups and broad changes in political attitudes." *Ketchum,* 740 F.2d at 1416. These changes may alter, or eliminate the need for a supermajority corrective figure. *Ketchum,* 740 F.2d at 1416.

In this case, the DOJ and the De Grandy/Reaves/Humphrey plaintiffs have established that Hispanics can elect candidates of their choice in Dade county and its surrounding areas when the Hispanics constitute at least 59 percent of an electoral district's VAP. Dr. Lichtman testified that in Dade County and its surrounding areas "[n]o Hispanic candidates have been elected in districts below a 59 percent Hispanic level, and in districts at 59 percent and above, those districts have in every instance elected Hispanic candidates." Tr. III–24. Based on the record as a whole, we find that the electoral characteristics of Hispanics in Dade County indicate that 60 percent is an appropriate guideline for determining if a fourth Hispanic VAP supermajority district can be created in the Dade County area. We note, however, that in areas with high concentrations of recent Hispanic arrivals, such as the South Beach area of Miami, an effective VAP supermajority district must have a VAP higher than our 60 percent guideline level. Tr. II–55.

The De Grandy/Reaves/Humphrey plaintiffs have established that four geographically compact districts can be drawn in which Hispanics in Dade County would have the potential to elect candidates of their choice. Plaintiff Reaves submitted Plan 180 which creates four Hispanic VAP supermajority districts. In Plan 180's four majority His-

panic districts, Hispanics constitute the following percentages of the VAP: (1) District 33—66.8 percent; (2) District 34—65.0 percent; (3) District 35—65.7 percent; and (4) District 40—62.1 percent.[46] Although this plan remedies the dilution of the Hispanic vote, we must examine the extent to which the plan addresses the African–Americans' vote dilution claim.

Plan 180, like Florida's Senate plan, creates two African–American VAP majority districts. Nevertheless, these two districts do not fully address the vote dilution claim of African–Americans. The NAACP takes exception to Florida's Senate reapportionment plan as it pertains to Dade County and the surrounding areas because the state's proposed plan fragments the African–American population concentrations such that African–Americans comprise a majority of the VAP in only two South Florida districts. Specifically, the NAACP contends that if the racial and ethnic population concentrations existing in the Dade County area are divided into equally populated Senate districts which respect communities of interest and follow other non-discriminatory plan drawing criteria, African–Americans would constitute a voting age majority of the population in an additional Senate district.

Like Hispanics, African–Americans must also constitute a supermajority of the total population of a district in order to be able to elect candidates of their choice due to a young population. See Ketchum, 740 F.2d at 1412–1413. African–Americans, however, may not need a supermajority of the VAP of a district because the minority group has experienced changes in its electoral charac-teristics. We take judicial notice of the fact that Jesse Jackson's 1984 and 1988 presidential campaigns stimulated African–American registration and turn-out nationally. See Ketchum, 740 F.2d at 1416 n. 21. Thus, we find that because of changing African–American electoral characteristics, a simple majority of the VAP is an appropriate guideline for determining if a third African–American majority VAP district can be created in the Dade County area.

The NAACP has established that three geographically compact districts can be drawn in which African–Americans in Dade County would constitute a majority of the VAP and have the potential to elect candidates of their choice. The NAACP submitted a plan which creates three African–American VAP majority districts. Two of the African–American VAP majority districts consist of Dade County area residents with one district spilling over into areas of Broward County. The other South Florida African–American VAP majority district is in the Broward/Palm Beach area and is comparable to the Broward/Palm Beach district in Florida's Senate reapportionment plan. In the NAACP plan's three African–American VAP majority districts, African–Americans constitute the following percentages of the VAP: (1) District 39 in Dade—51.7 percent; (2) District 37 in Dade and Broward—53.6 percent; and (3) District 35 in Broward and Palm Beach—51.6 percent. This plan's creation of three African–American VAP majority districts remedies the dilution of the African–American vote in the South Florida, however, it fails to address the vote dilution claim of Hispanics in Dade County because the plan only creates three Hispanic VAP supermajority districts.

---

**46.** Plaintiff De Grandy, on the other hand, submitted plan 275 which also contains four Hispanic voting age population majority districts. In plan 275's majority Hispanic districts, Hispanics constitute the following percentages of the voting age population: (1) District 33—71.5%; (2) District 34—66.1%; (3) District 35—55.0%; and (4) District 40—66.2 (Plan 275). District 35 in this plan falls short of our 60 percent guideline and De Grandy's own expert, Dr. Moreno, admitted that district 35 was "problematic" because its 55 percent VAP was probably too low for Hispanics to be able to elect candidates of their choice. Tr. II–66. Additionally, this district includes the South Beach area of Miami which contains a large number of recent arrivals who are noncitizens. Tr. IV–158. This additional fact makes this 55 percent district unacceptable and we reject plan 275 as a viable option.

This court is faced with two independent, viable Section 2 claims in South Florida and our remedy must address both of those claims. An ideal solution would be to order the drawing of four supermajority VAP Hispanic districts and three majority VAP African–American districts in South Florida. The evidence in this case, however, established that the ideal remedy for the Section 2 violations in this case is not a viable option. During the course of the examination of John Gutherie, Staff Director of the Senate Committee on Reapportionment, the court inquired about the possibility of creating a plan containing four Hispanic and three African–American districts.

JUDGE HATCHETT: Yes, he has the answer. I have a question, though. From all of your experience working in South Florida, is it possible to draw four VAP majority Hispanic districts and three majority black districts?

. . . .

THE WITNESS: It's amazing, Your Honor, what you can do with these computers. . . .

If you ask me would I believe that you could do it, I would believe that. But it gets to the notion of—because of numerosity—of how thin you're willing to cut your margins on both the African–American and the Hispanic seats, cutting them down to a bare VAP majority in order to accomplish that.

JUDGE HATCHETT: You've answered my question.

Tr. IV–194–195. In trying to create a plan with four Hispanic supermajority VAP districts and three African–American majority VAP districts, the NAACP was confronted with Gutherie's "numerosity" concern and his concern over how much of a margin is necessary to insure that minorities have opportunities to elect candidates of choice.

Counsel for the NAACP, Charles Burr, informed the court that "it is technically feasible to draw a four and three, but we were completely unable to get the percentages of the districts up to a level that I believe the parties will find acceptable." Tr. IV–217.

Thus, the NAACP concluded that in order to create four Hispanic supermajority VAP districts and three African–American majority VAP districts, the number of minorities found in each district can be no more than our bare VAP majority guidelines. Additionally, the NAACP realized that these districts would contain an insufficient level or margin to ensure that minorities would have the opportunity to elect candidates of their choice.

After realizing that the NAACP had also established a Section 2 violation with respect to African–Americans, in that a third African–American VAP majority district could be created, plaintiff Reaves argued to the court that Plan 180 is in fact a "four-three plan." To establish that Plan 180 does in fact create three African–American VAP majority districts in addition to its four Hispanic VAP supermajority districts, plaintiff Reaves compared his African–American districts to those found in the NAACP's plan. Plaintiff Reaves contends that the NAACP's District 37, which is comprised of Broward and Dade Counties, is comparable to Plan 180's District 32 which also covers Broward and Dade County. Additionally, Reaves points out that the NAACP's District 39 which is wholly within Dade County, is comparable to Plan 180's District 36 which is also wholly within Dade County. Finally, Reaves argues that District 35 in the NAACP plan, a Broward/Palm Beach Senate seat, is comparable to Plan 180's District 28 which goes through Broward and St. Lucie County. Thus, plaintiff Reaves asserts that Plan 180 creates, in essence, three African–American VAP majority districts without diluting the Hispanic vote.

Contrary to the assertions of plaintiff Reaves, we find that Plan 180 does not create three African–American majority VAP districts, and in fact, dilutes the African–American vote. Plan 180's third "African–American seat," District 28, does not contain an African–American majority VAP. African–Americans in District 28 of Plan 180 only constitutes 47.1 percent of the VAP. Guther-

ie describes this less than majority seat as follows:

> What is sometimes referred to as an access or influence seat begins in the Pompano Beach area north of Ft. Lauderdale, proceeds up to West Palm Beach and then across the Everglades into—the Everglades agricultural area—into Ft. Myers and northward through St. Lucie County, Ft. Pierce into Vero Beach and Indian River County.

Tr. IV–153–54. Gutherie also points out that the configuration of District 28 is the result of Plan 180's inclusion of African–Americans in Ft. Lauderdale and the adjoining communities into District 32, the Plan's second African–American majority district which is comprised of portions of Dade and Broward Counties. Tr. IV–157. Specifically, Gutherie notes that:

> Because this large concentration population in downtown Ft. Lauderdale is not available for a further access seat or majority society north of Dade County, what Plan 180 has to do in order to accomplish that end is string a district as we discussed earlier, District 28, going from Pompano Beach north to Vero Beach and Indian River County, and west of Ft. Myers on the Gulf Coast.

Tr. IV–157–58. Thus, based on the record as a whole we find that Plan 180 does not create three African–American VAP majority districts.

Not only does Plan 180 fail to create a third African–American majority VAP district, Plan 180 is retrogressive to African–Americans in Dade County and the surrounding areas. With respect to the two African–American majority VAP districts and Plan 180, Dr. Weber testified that after analyzing the turnout for those particular districts, that it was his opinion that

> based upon that analysis of turnout, the same kind of analysis I did for the Hispanic districts, that those districts are designed—and I'm sorry to use these words, and they may be offensive to some people in the courtroom, but they are designed to

waste African–American votes.... They are packed, and there are more African–Americans than are necessary to provide a realistic opportunity for African–Americans to elect candidates of choice.

Tr. VI–135. Additionally, with respect to District 28, Dr. Weber testified that his turnout test for that district indicated that it would "fail miserably in terms of [its] ability to put African–Americans in control on the general election day." Tr. VI–136. Thus, Dr. Weber concluded that Plan 180's packing of African–Americans into District 32 and 36 in order to facilitate the creation of four Hispanic supermajority VAP districts, had a "decimating effect" on the possibility of creating an additional African–American majority seat in South Florida. Tr. VI–136. Based on the record, we find that plan 180 creates only two African–American majority VAP districts and its third African–American access district has tested to be ineffective. Thus, Plan 180 is in essence a four/two plan which continues to dilute the African–American vote.

■ After considering all of the evidence, this court came to the conclusion that the remedy for the Hispanics' Section 2 claim in South Florida and the remedy for the African–Americans' Section 2 claim in South Florida were mutually exclusive. Tr. VIII–53. The state of Florida, faced with the competing interests of Hispanics and African–Americans in Dade County, sought to strike the fairest balance in its Senate reapportionment plan with respect to all the Dade County ethnic communities. The Supreme Court has held that:

> Reapportionment is primarily a matter for legislative consideration and determination ... state legislatures have 'primary jurisdiction' over legislative reapportionment.... A federal district court, in the context of legislative reapportionment, should follow the policies and preferences of the state, as expressed in statutory and constitutional provisions, or in the reapportionment plans proposed by the state legislative, whenever adherence to state policy does not detract from the requirements of the federal Constitution.

*Upham v. Seamon,* 456 U.S. 37, 41, 102 S.Ct. 1518, 1521, 71 L.Ed.2d 725 (1982) (quoting *White v. Weiser,* 412 U.S. 783, 795, 93 S.Ct. 2348, 2354, 37 L.Ed.2d 335 (1973)). Because state legislatures have primary jurisdiction over legislative reapportionment, we must examine the state of Florida's policy choices and preferences as we determine the proper remedy for balancing the competing minority interests in South Florida. Realizing that the creation of a fourth Hispanic VAP supermajority district would adversely affect African–Americans in South Florida and that the creation of a third VAP majority district would adversely affect Hispanics in Dade County, the Florida Senate plan reaches a compromise in that it creates three supermajority Hispanic VAP districts and two majority African–American districts with a strong African–American influence district in the Dade County area.

The influence district in the Florida plan, as Gutherie describes,

commences in the Liberty City/Overtown area, proceeds south through the Black Grove, Black Coral Gables, and south in Dade County through Leisure City, Richmond Heights, down and through Homestead and finally ending in Florida City. That district also includes Monroe County. The overall African–American VAP of that district is 35.5 percent. The district includes, by the way, most of current House District 118. House District 118 is a district which has 26 percent African–American VAP, 30 percent Hispanic VAP.

In 1990, Tom Easterly, a white incumbent, left a seat in order to run for the Florida Senate. There was a primary, a democratic primary, which was contested by two African–Americans. Those were the only two people on the ballot. And the winner of that primary, Daryl Jones, won the general election by a margin of 65 percent over the Republican opponent.

Tr. IV–155. This influence district, District 40, in the Florida Senate reapportionment plan, creates in essence a district in which African–Americans can elect a candidate of their choice because of strong minority coalitions between the African–Americans and the Mexican–Americans, as well as white cross-over votes. Representative Willie Logan, Chairman of the Florida Caucus of Black State Legislators, testified that:

The Joint Resolution as adopted by the Supreme Court better represents the black community not only in Dade County, but in south Florida. And the reasons for that are very simple: first of all, the seat that's in south Dade, which is only a thirty-some-odd-percent voting age population seat, also includes non-Cuban Republican Hispanics, that which are the Mexican community, which have proven over a period of time that they support not only Democratic candidates, but they are willing to support black candidates. And that was an example in the Daryl Jones House seat that also was testified at the south Dade hearing by the American–Mexican community, that they prefer to be in the district that would be represented by a black versus being in a district that would was being Republican.

Tr. III–147. Additionally, Representative Logan testified that the Florida Senate reapportionment plan comported closely with the desires of African–Americans with respect to having an African–American district based in the Ft. Lauderdale area of Broward County, and two African–American districts based in Dade County. Tr. III–156. Thus, this court finds that the Florida Senate Reapportionment Plan's Dade County African–American influence district performs as a third African–American district without adversely affecting Hispanics in the Dade County area. The court in *DeBaca,* noted in discussing balancing the interest between two minority groups that

Federal courts have recognized that these political questions do exist and that the best means to resolve them is in the process of give-and-take between citizens and their elected officials. Political questions necessarily require that policy choices be made before they can be resolved. This is not a task federal courts are equipped to handle. They have recognized their shortcomings in this area, and will, whenever possible, defer to legislative policy choices, even if the choice is perceived to be unwise or is simply not the optimum choice.

*DeBaca*, 794 F.Supp. at 992–93 (citing Strange, *Application of Voting Rights Act to Communities Containing Two or More Minority Groups—When is the Whole Greater than the Sum of the Parts?*, 20 Tex.Tech. L.Rev. 95, 124–125 (1989)). We find that between all the plans presented to the court, the Florida Senate Reapportionment plan is the fairest to all the ethnic communities in Dade County and the surrounding areas, and is the proper remedy in this case. Consequently, this court gives deference to the state policy as expressed in the Florida plan as validated by the Florida Supreme Court and imposes that plan as the remedy in this case. *See Upham v. Seamon*, 456 U.S. 37, 102 S.Ct. 1518, 71 L.Ed.2d 725 (1982).

### B. The House

█ Florida's House plan creates thirteen minority-majority districts of which nine have Hispanic VAP supermajority districts and four have African–American VAP majority districts. Eight of the nine Hispanic districts are contained in Dade County and the ninth Hispanic district is in Collier County. The four districts containing an African–American majority VAP are contained in Dade County. In the nine Hispanic supermajority VAP districts, Hispanics constitute the following percentages of the VAP: (1) District 102—65.68 percent; (2) District 107—63.85 percent; (3) District 110 is 83.64 percent; (4) District 111 76.56 percent; (5) District 112—68.67 percent; (6) District 113—75.70 percent; (7) District 114—78.38 percent; (8) District 115—65.28 percent; and (9) District 117—69.18 percent. African–American constitute the following percentages of the VAP in the four African–American districts: (1) District 103—55.73 percent; (2) District 104—50.96 percent; (3) District 108—57.24 percent; and (4) District 109—55.21 percent. Florida's House reapportionment plan creates twenty Dade County districts of which seventeen are wholly within Dade County and two share populations with other counties. District 102 joins population in Dade County with Collier County, and District 120 joins population in southern Dade County with Monroe County.

The De Grandy/Reaves/Humphrey plaintiffs and the DOJ take exception to Florida's House reapportionment plan as it pertains to Dade County because Florida's House plan fragments the Hispanic population concentrations such that Hispanics constitute a majority in only nine House districts. The plaintiffs contend that if the Dade County area of the State is divided into equally populated House districts which respect communities of interests and follow other nondiscriminatory plan-drawing criteria, Hispanics would constitute a supermajority of the VAP in two additional House districts.

For reasons already discussed in connection with the Senate, we hold that VAP is the relevant number for creating minority-majority House districts and that a supermajority of the VAP is necessary to create districts in which Hispanics can elect candidates of their choice. *See supra* section III, A. Additionally, we note that a supermajority VAP of 60 percent is an appropriate guideline for determining if two additional Hispanic districts can be created in the Dade County area. *See supra* Section III, A. In this case, the DOJ and the De Grandy/Reaves/Humphrey plaintiffs have established that eleven geographically compact districts can be drawn in which Hispanics in Dade County would have the potential to elect candidates of their choice.

The De Grandy/Reaves/Humphrey plaintiffs submitted the De Grandy plan which creates eleven Hispanic supermajority VAP districts. Hispanics constitute the following percentages of the VAP in the De Grandy plan's eleven Hispanic districts: (1) District 105—71 percent; (2) District 108—78.2 percent; (3) District 109—64.6 percent; (4) District 110—66.2 percent; (5) District 111—65.8 percent; (6) District 112—64.5 percent; (7) District 113–66.6 percent; (8) District 114—65.8 percent; (9) District 115—68.2 percent; (10) District 116—65.8; and (11) District 117—65.6 percent. This plan remedies the dilution of the Hispanic vote and does not adversely affect African–Americans because it creates four African–American districts. In the four African–American districts, African–Americans constitute the following percentages of the VAP: (1) District 102—57.6 percent; (2) District 103—57.8

percent; (3) District 106—57.7 percent and (4) District 107—57.3 percent.

Pursuant to *Upham v. Seamon* and *White v. Weiser*, this court sought to limit its intrusion upon state policy to what was necessary to correct the Section 2 violation. Accordingly, we allowed the State of Florida to present another House plan which remedied the dilution of the Hispanic vote and preserved its policy choices. The Florida House defendants initially presented a remedy containing only ten Hispanic districts which this court rejected as not fully remedying the dilution of the Hispanic vote. After warning the court to be very careful and deliberate in considering any changes to the Florida House plan, the Florida House defendants presented another remedial plan. Tr. VIII–126.

The Florida House defendants' second remedial plan contained eleven Hispanic supermajority VAP districts and four African–American VAP districts. In the House defendants' second remedial plan, the changes were confined to Dade County. Tr. VIII–126. The eleven Hispanic districts in the Florida House defendants' second remedial plan contain the following Hispanic VAP percentages: (1) District 102—65.78 percent; (2) District 106—61.34 percent; (3) District 107—61.05 percent; (4) District 110—77.66 percent; (5) District 111—77.39 percent; (6) District 112—62.77 percent; (7) District 113—62.22 percent; (8) District 114—65.23 percent; (9) District 115—65.29 percent; (10) District 116—65.60; and (11) District 117 at 63.81 percent. With respect to African–Americans, the second remedial plan created four African–American districts containing the following African–American VAP percentages: (1) District 103—61.51 percent; (2) District 104—55.10 percent; (3) District 108—55.25 percent; and (4) District 109—64.60 percent.

Because the Florida House defendants arbitrarily confined its changes to Dade County, the House defendants' second remedial plan does not create eleven effective House districts which give Hispanics the potential to elect the candidates of their choice. The second remedial House plan creates two House districts in the Miami beach area

which as we noted earlier has high concentrations of recent arrivals and non-citizens. Tr. VIII–129–130. Additionally, these two districts, District 106 and District 107, have Hispanic VAP of 61 percent. Tr. VIII–130. We noted in our discussion of Florida's Senate plan that areas with high concentrations of recent Hispanic arrivals must have a VAP significantly higher than our 60 percent guideline level. *See supra* Section III, A. Because these two 61 percent districts are located in areas with high concentrations of recent Hispanic arrivals, we find that these districts do not give Hispanics a reasonable opportunity to elect candidates of their choice. Hence, we reject the Florida House defendants' second remedial plan because it failed to remedy the dilution of the Hispanic vote in South Florida.

The De Grandy/Reaves/Humphrey plaintiffs presented the modified De Grandy plan which sought to respect the policy choices of the state of Florida by merging the De Grandy remedy for South Florida into the existing Florida plan. The eleven Hispanic South Florida districts in the modified De Grandy plan contain the following Hispanic VAP percentages: (1) District 105—71.62 percent; (2) District 108—81.89 percent; (3) District 109—63.74 percent; (4) District 110—62.56 percent; (5) District 111—66.19 percent; (6) District 112—65.10 percent; (7) District 113—66.06 percent; (8) District 114—66.39 percent; (9) District 115—68.52 percent; (10) District 116—65.83 percent; and (11) District 117—66.24 percent. With respect to African–Americans in South Florida, the modified De Grandy plan creates four African–American districts containing the following African–American VAP percentages: (1) District 102—55.12 percent; (2) District 103—59.54 percent; (3) District 106—57.93 percent; and (4) District 107—56.46 percent. The modified De Grandy plan also creates a strong African–American access district in South Florida with an African–American VAP of 40.34 percent.

The modified De Grandy plan of course contained minor adjustments to district lines outside of Dade County in order to comply with the rule of "one person, one vote." Plaintiff De Grandy testified that:

What we tried to do in the De Grandy Modified was to as much as possible enhance a little more the—a couple of the African–American seats while at the same time not impacting and trying to fit in the plan not impacting any other county than that which was impacted by Dade. That includes Dade; Monroe, which had a district in the Florida plan coming into Dade; Collier, which had a district in the Florida plan coming into Dade and Broward County.

When you fit the plan, you have to not only fit the configuration, but also in terms of half the population of each district you have to deviate to comport with the plan you are fitting into. And while doing that, we also, when we were deviating that population tried to in effect, you know, boost our seats or minority seats more than they are in the De Grandy plan.

So, basically, Your Honor, what we are really arguing is, Your Honors, please accept the De Grandy plan and accept it in the manner we have inserted it. That's what we are really arguing.

Tr. VIII–106–107. The plaintiffs are correct that in adopting a South Florida remedy adjustments must be made between what is in the Florida plan north of Dade and what the court adopts. The total enfranchisement of the minority populations in Dade County through creating a fair plan, causes a "ripple effect" into other counties leaving the problem of how to adjust the affected districts. The modified De Grandy plan minimized this "ripple effect" to eleven districts outside of Dade County. We find that the modified De Grandy plan best remedies the dilution of the Hispanic vote in South Florida while advancing the interests of African–Americans in South Florida. Accordingly, this court adopted the modified De Grandy plan as the court's plan and imposed that plan.

## IV. CONCLUSION

This court issued orders following the completion of this case which carried out the conclusions expressed in this opinion. (Docs. 553 and 554). We held in our order imposing the 1992 Florida Senate Plan that the Florida Senate plan does not violate Section 2 of the Voting Rights Act of 1965, as amended. (Doc. 553.) This language should be read as holding that the Florida Senate plan does not violate Section 2 such that a different remedy must be imposed. In other words, although the Florida Senate plan violates Section 2 of the voting rights act, it nevertheless is the best remedy to balance the competing minority interests in Dade County and the South Florida area. With respect to Florida's House of Representatives Districts we adopted the Modified De Grandy House of Representative Plan, Plan 268, as the court's plan and also impose that plan.

VINSON, District Judge, concurring.

I join in the opinion, but set out separately my rationale for the result.

(1) Section 2 claims under the Voting Rights Act must meet the three-part test of *Thornburg v. Gingles,* 478 U.S. 30, 50–51, 106 S.Ct. 2752, 2766–67, 92 L.Ed.2d 25, 46–47 (1986): (a) a minority population that "is sufficiently large and geographically compact to constitute a majority" in a district; (b) a "politically cohesive" minority group; and (c) a white majority that "votes sufficiently as a bloc to enable it ... usually to defeat the minority's preferred candidate."

(2) For Dade County, the second and third parts of the test are established by the overwhelming weight of the evidence in this case, subject to some variations among Hispanics from different counties of origin, and subject to the distinction that the Hispanic minorities are generally diametrically opposed to the voting preferences of the African–American minorities.

(3) Thus, the issue in both the challenge to the Florida Plan for the state Senate districts and for the state House districts in Dade County is a very narrow one: Have the plaintiffs established that the minority populations are sufficiently large and geographically compact to constitute a voting age majority in a district?

(4) Regarding the Senate challenge, the Hispanic plaintiffs established that they could have a fourth Hispanic-majority district that would be geographically compact, but only by either diluting the voting strength of

African–American majority districts or by preserving such strength in districts that are not geographically compact. The African–American plaintiffs established that they could create a third African–American majority district only by using a district that was not geographically compact and which would also greatly dilute the voting strength of Hispanics. Moreover, it is impossible to accommodate both four Hispanics and three African–American majority districts in any acceptable manner. Therefore, while the plaintiffs have established a Section 2 violation as to the four Hispanic districts, any remedy implementing the fourth district would violate Section 2 as to African–Americans. Thus, the existing Florida Plan for the Senate districts best accommodates the competing interests of both Hispanics and African–Americans.

(5) Regarding the House challenge, the plaintiffs have established in the De Grandy plan that eleven districts can be established in which Hispanics constitute over 64% of the voting age population and which are geographically compact. Further, these districts can be drawn without any dilution of African–American voting strength. Therefore, plaintiffs have 75 established all requisites of their Section 2 claim as to the Dade County districts for the House of Representatives.

(5)(a) The defendants have attempted to show that it is the *citizen* Hispanic voting age population that is determinative. That Hispanic citizenship data is not available, however. Despite the lack of available data, the defendants presented estimates of Hispanic citizenship and attempted to apply them to the individual districts. Those estimates are unreliable. For example, William De Grove's analysis was based on a somewhat unorthodox regression analysis methodology that gave a range of non-citizenship rates of 9.5% for precincts with no Hispanics to 55% for precincts with 100% Hispanic voters. (Acknowledging, of course, that there is no such precinct.) He recognized that the error in that analysis was greatest at the extremes, i.e. at the 9.5% and 55% intercepts. Nevertheless, he used the 55% as the basis of all his citizenship calculations.

Plainly, his estimated Hispanic citizenship ratios for the eleven districts must be viewed with low confidence and with a large range of error.

(5)(b) A better gauge of eligible voters within a district is the analysis of past election results. Those statistics established that Hispanics would be able to elect Hispanic candidates of choice in all eleven districts proposed by plaintiffs, and those statistics automatically account for voter citizenship, registration, and turn out. Thus, in the absence of any better data, the plaintiffs' evidence is sufficient. Further, Dr. Allan Lichtman's calculations for the plaintiffs, based in part on the defendants' citizenship data estimates, reflected an Hispanic voting age citizenship of 50% or more in all of the questioned eleven districts. This is a more relevant calculation, for the supermajority percentages are merely designed to account for, *inter alia,* citizenship.

(5)(c) Equally important, it is unrefuted that Hispanics have been able to elect the Hispanic candidate of choice in every district in which Hispanics constitute 59% or more of the voting age population (without regard to citizenship). It is not necessary to target anything greater than that. Nor is it necessary, although it may be desirable, to create a supermajority of 65% Hispanics (or 55% African Americans) to accomplish Section 2's purposes. Additionally, the growth trends in Dade County's Hispanic population indicates that the percentage of Hispanics will continue to increase, but the plaintiffs' Section 2 claims have been evaluated only on the basis of the 1990 census data. That data clearly establishes that the eleven districts meet the *Gingles* test.

(6) The remedial aspect of this court's adoption of the modified De Grandy plan presented a major challenge. In recognition of the respect due to the state's own policy and plan for redistricting, this court considered the defendants' two submitted plans, neither of which was even close to meeting Section 2's requirements and incorporating eleven Hispanic districts in Dade County in accordance with this court's findings on liability. At plaintiffs' suggestion, this court then requested that the defendants draw a

plan that incorporated the De Grandy plan for Dade County into the rest of the state. The defendants refused, however, and the court recessed to consider all of the alternatives available and make a decision. Because of the severe time constraints and the upcoming July 4th holiday weekend, it was critical that a plan be adopted without further delay. It was also apparent that the defendants were intent on delaying the adoption of any plan that implemented a true eleven-Hispanic districts House plan for Dade County. Accordingly, this court adopted the modified De Grandy plan. It does, of course, have a "ripple effect," but that effect is relatively minor and simply cannot be avoided. The defendants' belated change of position and announcement that they would attempt to draw a plan incorporating the eleven Hispanic districts from the De Grandy plan into the rest of the state came too late.